No. 107,571

STATE OF KANSAS, *Appellee*, v. RONNELL BURNETT, *Appellant*.

(329 P.3d 1169)

Opinion filed July 25, 2014.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Christopher L. Schneider*, assistant district attorney, argued the cause, and *Elizabeth A. Evers*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: A jury found Ronnell Burnett guilty of felony murder, criminal discharge of a firearm at an occupied dwelling, and criminal possession of a firearm. On appeal, Burnett argues that the district court erred by (1) excluding evidence of prior and subsequent shootings taking place at the same residence where the shooting at issue here took place; (2) refusing to grant defense counsel a continuance during trial to edit and present a redacted video recording of Burnett's interview with a detective; (3) instructing the jury on felony murder; (4) admitting into evidence copies of letters that Burnett had placed in the jail's outgoing mail; (5) failing to give a limiting instruction regarding evidence of other crimes or civil wrongs committed by Burnett; (6) failing to adequately investigate Burnett's request for substitute counsel made between his first and second trials; and (7) failing to grant a new trial based on ineffective assistance of trial counsel. Burnett also argues that the cumulative effect of these alleged trial errors denied him a fair trial.

We conclude that the district court erred in preventing Burnett from presenting evidence of other shootings taking place at the residence for the limited purpose of cross-examining investigators who testified about the manner in which the shooting at issue here occurred. But, considering the evidence presented at trial, we conclude that this error was harmless. Similarly, we conclude that the failure to give a limiting instruction regarding Burnett's other crimes or civil wrongs did not constitute clear error. Finding no other error on the remaining issues Burnett raises, we affirm Burnett's convictions.

## FACTS

Tyrone Ramsey and Simone Dickson were engaged in an intimate relationship that resulted in children. At some point, this relationship ended and Dickson began to have a relationship with Burnett, which caused tensions to arise between Burnett and Ramsey. According to Dickson, Ramsey would call Burnett's phone "all the time making threats and stuff."

At around 5 p.m. on July 7, 2008, Dickson and Burnett had a verbal confrontation in Dickson's apartment in North Kansas City, Missouri. The confrontation eventually moved to the apartment's parking lot where Dickson got into her car and tried to run over Burnett. As Dickson was driving away, Burnett threw a bottle of gin and a bottle of orange juice through the sunroof of Dickson's car. The plastic orange juice bottle hit Dickson in the head but did not injure her. Dickson proceeded to drive to a Target store, and Burnett followed her in his work truck—a Frosty Treats ice cream truck. Burnett followed Dickson on foot into and out of the store and then followed Dickson in his work truck back to her apartment, where he then drove away.

At some point, Dickson and Ramsey spoke over the phone about the bottle-throwing incident. Ramsey then called Burnett to ask him about throwing a bottle at Dickson. According to Ramsey, before he could say anything, Burnett threatened to kill him. Ramsey hung up on Burnett, but Burnett continued to call him.

At the time, Ramsey was at his residence in Kansas City, Kansas, with his nephew, Willie Claiborne, and Claiborne's friend, Rahi Larks, the victim in this case. Eventually, Ramsey's cousin, Steven Allen, came by the residence and picked up Ramsey, leaving Claiborne and Larks behind. Ramsey and Allen went to Allen's house and drank a few beers. While there, Burnett continued calling Ramsey. Fed up with Burnett calling him, Ramsey had Allen drive him to Burnett's location—Dickson's mother's residence, also in Kansas City, Kansas, and located near Ramsey's house. Ramsey later explained that he wanted to go there to confront Burnett.

When Ramsey arrived at the residence, he started yelling for Burnett to come out of the house and fight him. When that failed to entice Burnett outside, Ramsey started breaking out the windows of Burnett's work truck, which was parked in the driveway. Eventually, Dickson's mother came outside and told Ramsey that she was calling the police, prompting Ramsey and Allen to leave. As they were leaving, Ramsey said that he saw Burnett standing by his work truck, talking on a cell phone. Ramsey estimated that it was around 9:30 p.m. when he left Dickson's mother's residence. It was later confirmed that Dickson's mother called 911 at 9:33

p.m. and reported that Ramsey was damaging Burnett's work truck. Ramsey and Allen returned to Allen's house.

According to Claiborne, as he and Larks were getting ready to leave Ramsey's house sometime after 9 p.m., gunshots were fired into the front room of the house. A single bullet hit Larks as he was fleeing into a back bedroom. He died within moments.

Shortly after 11 p.m., law enforcement arrived at the scene and began investigating the shooting. Law enforcement developed leads that indicated that they should speak to Ramsey and Dickson. One of Larks' family members also contacted police and stated that he or she believed Burnett was responsible for the murder.

Detective Bryan Block of the Kansas City, Kansas, Police Department spoke to Dickson. At first, Dickson denied knowing anything about the shooting. But after Block told Dickson that if she withheld any information about the shooting, her children could be taken away from her and that she and her mother could end up in jail, Dickson told Block about the altercation she had with Burnett, Ramsey vandalizing Burnett's work truck, and Burnett calling her later that night and telling her that he had shot at Ramsey's house.

After speaking with Dickson, Block spoke with Ramsey. Ramsey told Block about Burnett threatening to kill him over the dispute they were having involving Dickson. Ramsey admitted to going over to Dickson's mother's house and breaking out the windows of Burnett's work truck.

Block spoke with Burnett on July 11, 2008, at police headquarters. After being advised of and waiving his *Miranda* rights, Burnett told police about his dispute with Ramsey, which, according to Block, Burnett downplayed. Burnett told Block that he went to Ramsey's house earlier that evening to speak to him, but Ramsey was not home. Burnett then went to Dickson's mother's house. While he was there, Ramsey showed up and called him outside to fight. Burnett said that as he was going outside, Ramsey left in his vehicle.

After Ramsey left, Burnett said that he ran to Ramsey's home and waited for Ramsey to arrive. Burnett eventually moved to a nearby park to wait. When Ramsey did not return, Burnett left and

went back to Dickson's mother's house. While there, Burnett said that he heard some "pops" that sounded like fireworks and one loud "boom."

Burnett told Block that he eventually left Dickson's mother's house and filled up his truck with gas and went back to his home in Kansas City, Missouri. Police later obtained a video of Burnett entering a Conoco station at 11:24 p.m. While viewing the video in court, Block said that there was a bulge in Burnett's shirt. On cross-examination, Block opined that Burnett, while walking, was holding his arm down like someone who was trying to keep a gun from shifting in his pants.

Block also spoke with Harold Murphy, a manager for Frosty Treats. Murphy told Block, and later testified at trial, that on July 7, 2008, he was training Burnett on his first day as a vendor for Frosty Treats at its place of business in Kansas City, Missouri. While Murphy was showing Burnett how to operate the lights of the ice cream truck assigned to him that day, Murphy noticed the butt of a semiautomatic handgun under the front seat. Murphy told Burnett that having a gun was not allowed. According to Murphy, Burnett mumbled something in reply. Murphy informed his supervisor about seeing the gun. Burnett eventually left in the ice cream truck.

Murphy said that Burnett did not return his truck by 9:30 p.m. on July 7 as required. He said that it was not until 11 a.m. the next day that Burnett returned the truck and that the truck had four shattered windows. Burnett did not explain why the windows were broken out. As Burnett was walking to his car, Murphy told him that he needed to speak to the supervisor. Murphy followed Burnett as he walked into the supervisor's office. As Burnett was sitting down and speaking to the supervisor, Murphy noticed a "bulge" under Burnett's shirt on the right side of his back near the waistline of his pants. Murphy said the bulge looked like the butt of a pistol.

Law enforcement recovered six .40 caliber cartridge cases, two fired bullets (one of which was recovered from Larks' body), and one fired bullet jacket fragment and submitted them for testing. A firearms and tool mark examiner with the Kansas Bureau of Investigation examined the cartridge cases and determined that they

were all fired from the same gun and that the markings on the cartridge cases were consistent with the markings left by a .40 caliber semiautomatic handgun manufactured by Hi-Point Firearms. The examiner also concluded that the two fired bullets were fired from the same gun—most likely a .40 caliber semiautomatic handgun manufactured by Hi-Point. The examiner, however, could not determine conclusively whether the bullet jacket fragment was fired from the same gun as the two fired bullets. The gun used in the shooting was never located.

While in jail awaiting trial, Burnett wrote two letters to Dickson. The record indicates that prior to Dickson receiving these letters, jail personnel opened and photocopied the letters and sent copies to the prosecutor's office. Highly summarized, in both letters Burnett asked Dickson to testify at trial that she made up the story about him calling her and telling her that he had shot up Ramsey's house. Burnett even provided Dickson with explanations she could give at trial for her prior statement and told her in one letter to "make up something that will help me" if she did not like his proposed testimony. Copies of these letters were admitted into evidence. In addition to the letters, Dickson said that Burnett called her on the phone and asked her not to testify that he admitted to the shooting into Ramsey's house.

Burnett's case proceeded to a jury trial which ended in a mistrial as a result of the jury's inability to reach a verdict. A second trial was conducted where the State presented the above-mentioned facts.

On cross-examination, Dickson admitted that during her interview with detectives, she initially denied knowing anything about the shooting. She said that the detectives did not believe her and they told her that if she withheld any information, her children could be taken away from her and she and her mother could end up in jail. Dickson said that she believed that unless she told the detectives something, they would follow through on their threats. She said that in order to avoid those consequences, she told law enforcement that Burnett had called her and admitted to shooting into the house. However, even in spite of law enforcement's coercive tactics, Dickson denied that she made up the story of Bur-

nett calling her and confessing to the shooting. Defense counsel also cross-examined Detective Block about threatening Dickson in order to get information from her.

The jury found Burnett guilty of all the charges. The district court sentenced Burnett to a hard 20 life sentence for the felony-murder conviction and consecutive sentences of 59 months' and 8 months' imprisonment for criminal discharge of a firearm at an occupied building and criminal possession of a firearm, respectively. Burnett filed a timely notice of appeal.

## EVIDENCE OF OTHER SHOOTINGS

Burnett first argues that the district court erred in excluding evidence showing that other shootings had taken place at Ramsey's house and that the house was in fact a "drug house." Burnett argues that this evidence was essential to his defense of innocence at trial because it would have controverted the State's evidence indicating that he was the only person who had the motive and means of committing the crime. According to Burnett, if he would have been allowed to present evidence that Ramsey's house was a drug house and that other shootings had taken place before and after the July 7, 2008, shooting, then this evidence would have raised the possibility in the jurors' minds that someone else may have shot at the residence on July 7. He also argues that he should have been allowed to present evidence of the other shootings in order to question investigators who attributed six bullet holes found at the front of Ramsey's house to the July 7 shooting. Each of Burnett's arguments will be addressed in turn.

"The threshold determination for the admission of evidence in any proceeding is relevance. [Citation omitted.] Relevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish. [Citation omitted.] Relevant evidence, as defined in K.S.A. 60-401(b), is 'evidence having any tendency in reason to prove any material fact.' In *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008), we explained that this definition of 'relevance' contains both a materiality element and a probative element. There, we held that an appellate court reviews a district court's determination of materiality de novo and the assessment of probative value under an abuse of discretion standard. [Citation omitted.]" *State v. Ultreras*, 296 Kan. 828, 857, 295 P.3d 1020 (2013).

*Applicable Facts*

Prior to Burnett's first trial, the State filed a motion in limine seeking to prevent Burnett from introducing evidence at trial that other shootings had occurred at Ramsey's house. At the hearing on the motion, the prosecutor informed the district court that when investigators went to the house to investigate the July 7 shooting, they discovered older damage to the home that appeared to have been caused by earlier shootings. The prosecutor also informed the court that a subsequent shooting had taken place at the house in October 2008. The prosecutor argued that based on the third-party evidence rule, evidence of these others shootings should be excluded at trial.

Burnett argued that the evidence of other shootings taking place at the residence should be admitted in order to support his defense that someone else committed the July 7 shooting. Furthermore, he argued that presenting evidence of the prior shootings, specifically all the damage the house sustained as result of gunfire, was essential to cross-examining the crime scene investigators who examined the house and concluded that six shots were fired at the front of the house on July 7, 2008. The district court granted the State's motion in limine.

Prior to Burnett's second trial, the State resubmitted its motion in limine. Burnett asked the district court to reconsider its prior ruling, arguing that he should be able to present evidence of prior shootings because he claimed that when crime scene investigators examined the house in connection with the July 7 shooting, they found a total of 17 bullet holes. The investigators attributed six of those bullet holes to the July 7 shooting because of the six shell casings found in the street in front of the house. Burnett argued that he should be able to mention the other 10 bullet holes in the house in order to cross-examine the investigators regarding their conclusions about the manner in which the July 7 shooting was carried out.

The district court concluded that admitting the evidence of prior shootings for the purpose of challenging the investigators' determination of how the shooting occurred was not relevant to Burnett's defense of innocence at trial.

At trial, the State presented the testimonies of police officers Ross Hatfield and Alan Jaskinia, members of the crime scene investigation unit who were dispatched to the house on July 7 to collect evidence of the shooting. Hatfield took photographs of the crime scene. Though the photographs are not part of the record on appeal, the trial transcript indicates that one photo showed a window to the left of the front door that had a trajectory rod running through it. Hatfield stated that the purpose of the trajectory rod was to demonstrate the flight path of a bullet that went through the window. During cross-examination regarding the picture, Hatfield admitted that the bullet hole going through the window "wouldn't necessarily match up" with a bullet hole found in the wall leading into the back bedroom where Larks was shot.

Jaskinia testified about collecting six .40 caliber cartridge cases from the street in front of the residence. Because the shell casings were shiny—as compared to casings with a dull, tarnished appearance caused by being exposed to the elements—Jaskinia concluded that the casings had not been outside for very long. Jaskinia opined that the location of the cartridge cases in the street in relation to Ramsey's house was consistent with someone standing in the street in front of the house and firing a semiautomatic gun multiple times at the house. Detective Block had a similar opinion, testifying "that someone stood in the street and fired into the residence through the window."

On cross-examination, Jaskinia conceded that the placement of the shell casings on the street did not rule out the possibility that the shell casings were ejected from a gun fired from a moving vehicle.

As mentioned above, law enforcement submitted for testing the six .40 caliber cartridge cases along with two fired bullets (one of which was recovered from Larks' body) and one fired bullet jacket fragment. It was later determined that the cartridge cases were all fired from the same gun and that the markings on the cases were consistent with the markings left by a .40 caliber semiautomatic handgun manufactured by Hi-Point Firearms. It was also determined that the two fired bullets were fired from the same gun— likely a .40 caliber semiautomatic handgun manufactured by Hi-

Point. Finally, it could not be determined conclusively whether the bullet jacket fragment was fired from the same gun as the two fired bullets.

After Burnett was convicted of the charges, he filed a motion for new trial in which he stated:

"The defendant should have been allowed to refer to the fact that the shooting in this case was at a drug house and that there were prior bullet holes, firearms and drugs in the house at which the victim was found. The State alleged that the house at which the victim was found was the home of Tyrone Ramsey. The jury was left with the false impression that this house was his home. In fact, it was a barely liveable house containing ammunition and drugs.

"That the defendant was precluded from referring to these facts is problematic in a couple of areas. First, the defendant was precluded from presenting a defense that someone else other than he was responsible for the homicide. Had the defendant been allowed to refer to this evidence, perhaps he could have argued that there was a reasonable doubt as to his guilt since it was possible that a rival drug dealer or someone wishing to rob him or the house of the narcotics and/or weapons was responsible for the death of the alleged victim. It is within the common knowledge and experience of the jury that drug houses in Kansas City, Kansas are the targets of robberies and shootings.

"Second, the defendant was precluded from arguing that the alleged victim could have been shot and killed by one of the weapons in the house. There were several live rounds of ammunition found in the house. Since the defendant was not allowed to mention the other potential firearms, he was precluded from arguing that perhaps one of them caused the death. The defendant was denied the right to present an effective defense when he was not allowed to mention the drugs and firearms."

The State responded by arguing that the district court properly excluded the evidence based on the third-party evidence rule, stating:

"Initially, Defendant endorsed several witnesses, including Detective William Michael, who investigated a homicide at the same location on October 3, 2008, approximately 3 months after Rahi Larks was killed. Such evidence was, and remains, irrelevant to the instant case. In addition, any testimony or evidence that shots had previously been fired at 2412 Haskell was irrelevant and amounted to an impermissible attempt to blame an unknown third party for the crime.

"At no time has Defendant identified any evidence that would connect any specific third party to this crime. Rather, Defendant merely sought to argue that a mythical 'someone else' could have killed Rahi Lark[s]. Defendant based this upon his assertion that the location was a drug house, and had been fired upon at some time in the past.

"Such evidence is irrelevant to the charges at issue and any attempt to introduce such evidence would serve no purpose other than to impermissibly impugn the character of the victim and witnesses."

The district court denied Burnett's motion for a new trial at sentencing. In doing so, the court specifically addressed Burnett's argument regarding the exclusion of third-party evidence:

"Certainly, the third party issue was argued at length regarding whether the shootings—some shootings had occurred prior, some shootings might have occurred after in regard to the house. Certainly, I reviewed the arguments from both sides and made a ruling that that was not relevant evidence and would not have given any sort of exculpatory emphasis to the defendant and certainly didn't point—there's never been any third party identified or even indicated that could have or, in fact, did commit the acts that the defendant was convicted of. So I—there was no basis. I think statutory and case law support the Court's position in that respect."

*Analysis*

*A. Admitting Evidence of Other Shootings to Show a Third Party's Involvement*

Initially, we note that though Burnett may have proffered sufficient evidence to show that shootings had taken place at Ramsey's house before and after July 7, 2008, at no time did he proffer any evidence to show that Ramsey's house was a "drug house" or that police found weapons and ammunition inside the house when they searched it on July 7. Accordingly, we find that Burnett has failed to preserve for appeal whether the district court erred in excluding this evidence. See *State v. Evans*, 275 Kan. 95, 99, 62 P.3d 220 (2003) ("When a motion in limine has been granted, the party being limited by the motion has the responsibility of proffering sufficient evidence to the trial court in order to preserve the issue for appeal.").

Whether a third party was responsible for the crime a defendant is charged with is clearly a material fact related to determining the defendant's guilt or innocence. We have previously stated that "[w]hile evidence of the motive of a third party to commit the crime, standing alone, is not relevant, such evidence may be relevant if there is other evidence connecting the third party to the crime." *State v. Brown*, 285 Kan. 261, Syl. ¶ 26, 173 P.3d 612

(2007). In other words, without additional evidence showing that a third party could have committed the crime (*e.g.*, presence at the crime scene, the opportunity and means to commit the crime), evidence merely suggesting that someone other than the defendant had a motive to commit the crime has little probative value and can be properly excluded at trial. "A district court judge must evaluate the totality of facts and circumstances in a given case to determine whether the defense's proffered evidence effectively connects the third party to the crime charged." 285 Kan. 261, Syl. ¶ 27. Because the district court's determination of this question contemplates whether the proffered evidence is probative to establishing a third party's involvement in the charged crime, the district court's decision is reviewed for an abuse of discretion. See *Ultreras*, 296 Kan. at 857 (An appellate court reviews a district court's assessment of probative value under an abuse of discretion standard.); see also *State v. Inkelaar*, 293 Kan. 414, 438, 264 P.3d 81 (2011) (A district court's decision under the third-party evidence rule is subject to an abuse of discretion standard of review on appeal.).

In *State v. Marsh*, 278 Kan. 520, 531, 102 P.3d 445 (2004), *rev'd on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), this court clarified that the admission of third-party evidence does not turn on the sometimes hazy distinction between direct and circumstantial evidence. In that case, Marsh was accused of killing a mother and her child, but there was also evidence that a third party—the husband and father of the victims—might have been involved in the murders. The *Marsh* court found that Marsh had proffered more than mere evidence of the husband's motive—the husband's blood and the blood of one of the victims had been found on Marsh's shoes. As a result, this court held Marsh's right to a fair trial had been violated by the trial court's exclusion of the third-party evidence. 278 Kan. at 533.

In *Evans*, the defendant tried to admit evidence that another person was seen holding the murder weapon immediately after the fatal shot was fired. There was also evidence that this person admitted to shooting the victim and later removing his body. In hold-

ing that the district court erred in not admitting the third-party evidence, this court stated: "Circumstantial evidence that would be admissible and support a conviction if introduced by the State cannot be excluded by a court when offered by the defendant to prove his or her defense that another killed the victim." *Evans*, 275 Kan. at 105-06.

In both *Marsh* and *Evans*, the defendants, in addition to proffering evidence of a third party's motive for committing the crime, proffered evidence showing that the third party was present at the crime scene. In contrast, in *Inkelaar* and *State v. Adams*, 280 Kan. 494, 505-07, 124 P.3d 19 (2005), though the defendants in each case had identified a third party with a possible motive for committing the crime, neither defendant could produce evidence placing the third party at the scene of the crime during the relevant time period. Accordingly, in both cases, this court found that the district court had not abused its discretion in excluding the proffered third-party evidence. *Inkelaar*, 293 Kan. at 441; *Adams*, 280 Kan. at 507.

In this case, Burnett proffered evidence establishing that Ramsey's house was the target of shootings before and after July 7 and suggested that because the house had been the target of other shootings—which he claimed were drug related—it was possible that someone else was responsible for the July 7 shooting. Though the evidence tends to show that the house attracted criminal activity, it fails to identify or show that someone other than Burnett was responsible for the July 7 shooting. Without evidence connecting the prior or subsequent shootings to the July 7 shooting (*e.g.*, the same gun was used in all the shootings), the evidence of prior or subsequent shootings has little probative value to establishing the material fact that someone other than Burnett committed the July 7 shooting.

Presenting such evidence in this case would be analogous to presenting evidence of prior and subsequent robberies of a convenience store when a defendant is charged with robbing the store on a specific date—for example, July 7. Without evidence showing that the person or persons responsible for the other robberies also committed the July 7 robbery, such evidence has little probative

value in establishing the defendant's innocence for the July 7 robbery. In fact, such evidence is less probative to establishing a third party's responsibility for the crime charged than the evidence found to be properly excluded at trial in *Inkelaar* and *Adams*. We conclude, therefore, that the district court did not abuse its discretion in excluding Burnett's proffered evidence at trial for the purpose of establishing a third party's responsibility for the crime.

B. *Admitting Evidence of Other Shootings for Purpose of Cross-Examining Crime Scene Investigators*

As mentioned above, the State presented evidence at trial indicating that on July 7, 2008, someone stood in the street in front of Ramsey's house and fired a .40 caliber semiautomatic handgun six times at Ramsey's house. One of the gunshots hit Larks and killed him. Burnett proffered evidence that the house had sustained other gunshots besides the six that the State was attributing to the July 7 shooting. We agree with Burnett's argument that questioning the investigators about these other gunshot holes could have impugned the State's theory that the July 7 shooting resulted from a lone gunman standing in the street and firing his weapon at the front of Ramsey's house. The presence or absence of explanations for why the other gunshot holes were disregarded would impact the weight of the State's evidence—its probativeness—rather than its materiality. Accordingly, we conclude that the district court erred in denying Burnett's request to question the investigators regarding the other gunshot holes to the house. We proceed with determining whether this error was harmless.

The erroneous exclusion of evidence is subject to review under the harmless error test of K.S.A. 60-261, which asks whether "there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." *State v. Ward,* 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Factors an appellate court can consider in reviewing the erroneous exclusion of evidence for harmless error include: "the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points,

the extent of cross-examination otherwise permitted, and the overall strength of the case." *Ultreras*, 296 Kan. 828, Syl. ¶ 11.

Though questioning the detectives about the other gunshot holes may have aided Burnett in challenging the evidence the State presented to show how the shooting occurred, we find that such questioning had little importance to Burnett's defense at trial. It was undisputed at trial that on July 7, 2008, someone fired multiple gunshots at Ramsey's house and that one of these gunshots struck and killed Larks. The main issue at trial was the identity of the shooter, and the State presented circumstantial evidence to identify Burnett as the culprit. Consequently, the exact manner in which the shooting occurred was not essential to the State's case-in-chief and had little bearing on Burnett's defense of innocence.

The State presented evidence showing that Burnett and Ramsey had an antagonistic relationship that was exacerbated on July 7 when Dickson called Ramsey and told him about Burnett hitting her with a juice bottle. When Ramsey called Burnett and asked him about the incident, Burnett threatened to kill Ramsey. The State presented evidence showing that Burnett possessed a gun on July 7 and that, after Ramsey had broken out the windows of Burnett's truck, Burnett had a motive and opportunity for firing his gun at Ramsey's house. Finally, Dickson testified at trial that Burnett called her later that night and admitted to shooting at Ramsey's house. She also testified about the letters she received from Burnett (admitted into evidence at trial) instructing her not to testify that he admitted to shooting Ramsey's house. Based on Burnett's statements within these letters (*e.g.*, "make up something that will help me" and "[t]hat's da only way I'll come home that day if you don't say anything to make me look guilty"), the jury could clearly infer that Burnett was wanting Dickson to commit perjury at trial by testifying that he did not admit to the shooting at Ramsey's house.

Based on our review of the entire record, we conclude there is not a reasonable probability that the trial's outcome would have been different had Burnett been allowed to question the investigators regarding the other gunshot holes to the house. Accordingly, we conclude that the error was harmless.

## DENIAL OF A CONTINUANCE

Next, Burnett argues that the district court should have granted him a continuance in order to prepare a redacted version of the video recording of his interview with Detective Block. Burnett claims that the recording of the interview was essential to cross-examining Block and that the district court's denial of his request for a continuance essentially denied him his right of confrontation.

K.S.A. 22-3401 states that a district court may grant a continuance "for good cause shown," and its refusal to grant a continuance will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Beaman*, 295 Kan. 853, 862, 286 P.3d 876 (2012).

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, in other words, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, in other words, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, in other words, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]" *State v. Warrior*, 294 Kan. 484, 505, 277 P.3d 1111 (2012).

### *Applicable Facts*

Detective Block testified at trial about the statements Burnett made during his interview. On cross-examination, Block admitted that in testifying about Burnett's statements, he was paraphrasing what Burnett had told him and not giving a verbatim recitation of Burnett's statements.

At a later point during Block's cross-examination, defense counsel asked to have a bench conference. At the bench, the following exchange took place:

"[DEFENSE COUNSEL]: I'm doing this preemptively, Judge. I'm beginning to move to introduce the statement, the video statement of Mr. Burnett that's been provided—a copy that's been provided to me. It's three hours long. It's very long. I don't necessarily want it published to the jury.

"However, the reason for doing so is because Detective Block is basically saying he was paraphrasing. He's reading from his report. The best evidence as to what Mr. Burnett actually told him would be the [recorded] statement and I believe that the jury should have the best evidence and not just what his recollection is of the—of what the statement was and his paraphrasing of it.

"[THE PROSECUTOR]: Judge, I don't have a particular objection to that, but I do want to make a record that as far as I have not redacted it in any way. The defendant does make reference to his prior incarceration. I don't think he discusses the nature of it, but he does discuss having gone to prison and being on probation, things of that nature, other extraneous information.

"Plus, I guess my objections would be it includes references to [Ramsey] being a drug dealer, none of which is relevant. So I am concerned about the admission of an unredacted statement. Now, if we want to redact it, I have no problem.

"[DEFENSE COUNSEL]: And if I can, Judge, the reason I—it's really kind of hard to cross-examine Detective Block on that, on each item that he's paraphrasing.

"THE COURT: The problem that you have is we're on the last witness of the State. What you're suggesting is gonna require more time than this Court can give you to do. If you had intended to do this beforehand, you should have prepared it beforehand and redacted all of the objectionable material both from the State's side and your client's side. You haven't done that. Now you want to do this at the last second. I'm not going to let you.

"[DEFENSE COUNSEL]: Okay. Well, you know, a lot depends on what the witness testifies to. And he's testified twice now and I think that in my mind, there were some things that he testified the first trial that are different than what he's testifying to.

"THE COURT: And if you knew that beforehand, you should have prepared the defendant's videotape and finished the statement so that it would be acceptable as an exhibit. You didn't do that. And now you've got two alternatives; the one you haven't taken care of and the other is your client could testify. Those are the only remedies I could see for you at this juncture.

"[THE PROSECUTOR]: Your Honor, if I may, I want to be clear for the record, at the last trial, the State did not introduce the statement.

"[DEFENSE COUNSEL]: No.

"[THE PROSECUTOR]: The detective didn't testify about it, period, because it never came in. That was a strategic decision the State made and obviously I have altered it for this trial. I never intended to introduce the three hour taped statement because redacting it was cumbersome and I just didn't think—the way that it would have—would have had to have been redacted would have made it very difficult to follow and it would have been obvious there was material missing. That's why I didn't do it.

"THE COURT: (Nodding head up and down.)

"[THE PROSECUTOR]: And, again, you know, I think this is material that's prejudicial to—both to the State and to the defendant that's contained within there. So I just wanted to make that clear for the record.

"THE COURT: I can understand that. All I'm saying is that at the eleventh hour, you don't have the time to prepare it for an acceptable exhibit. So I'm not going to let you do it, sir."

Subsequently, in Burnett's motion for a new trial, he argued that he was prejudiced when the district court denied him the opportunity to play the video recording of his statement to the jury. Burnett argued that

"Detective Block's testimony regarding the defendant's statement was extremely vague and he was unable to recall many details of the statement other than those that served the State. Defense counsel had not prepared a redacted version of the videotaped statement and neither had the State. In the previous trial, the State had not presented the defendant's statement. Counsel had no way of anticipating that the statement would be presented and further that the Detective would testify by loosely paraphrasing and not remembering several aspects of defendant's statement."

Accordingly, Burnett argued that district court's decision to not allow defense counsel time to prepare an admissible version of the recording prevented him from effectively cross-examining Detective Block.

*Analysis*

In his brief, Burnett argues that the district court's decision harmed his defense at trial because, without the video recording, he was unable to impeach Block's testimony regarding the interview. However, Burnett does not specify how Block's testimony was inconsistent with the statements recorded on the video or even explain how Block's testimony could have been impeached by the video.

Without specific references to how the video would have bolstered his defense or impeached Block's testimony, Burnett has failed to show that "good cause" supported his request for a continuance to prepare a redacted version of the video. See *Beaman*, 295 Kan. at 864 (in concluding that district court acted within its discretion in denying defendant's motion to continue sentencing hearing, court stated: "Mere speculation that with more time something favorable may happen for the defendant does not constitute good cause. [Citation omitted.]"). Consequently, we conclude that the district court did not abuse its discretion in denying Burnett's request for a continuance.

## ALTERNATIVE MEANS OF FELONY MURDER

The jury in this case was instructed that in order to convict Burnett of felony murder, the State had to prove that Burnett killed Larks and that this killing occurred during the commission, the attempted commission, or flight from the commission of an inherently dangerous felony, to wit: criminal discharge of a firearm into an occupied dwelling. Burnett argues that this instruction established alternative means of committing felony murder. Based on the super-sufficiency requirement for evidence in an alternative means case, see *State v. Wright*, 290 Kan. 194, 203-06, 224 P.3d 1159 (2010), *disapproved on other grounds by State v. Brooks*, 298 Kan. 672, 317 P.3d 54 (2014), Burnett argues that his conviction for felony murder must be reversed because the State failed to present sufficient evidence on all the means of committing felony murder that the jury was instructed on. Specifically, Burnett contends that no evidence was presented at trial showing that Larks was killed during an attempted discharge of a firearm into an occupied dwelling or during the flight after the crime was committed.

Recently, this court in *State v. Cheffen*, 297 Kan. 689, 699-702, 303 P.3d 1261 (2013), rejected the argument that the phrase "in the commission of, attempt to commit, or flight from an inherently dangerous felony" in the felony-murder statute created alternative means of committing felony murder. In reaching this conclusion, the *Cheffen* court stated:

"The felony-murder statute has two primary elements—killing and simultaneously engaging in an inherently dangerous felony. The second element can be established through proof that the killing occurred while the defendant was committing, attempting to commit, or fleeing from an inherently dangerous felony. These are simply factual circumstances in which a material element may be proven. Therefore, this language in the felony-murder statute does not create alternative means . . . ." *Cheffen*, 297 Kan. at 702.

Accordingly, Burnett's argument must be rejected. The jury was not instructed on alternative means of committing felony murder which obligated the State to prove that the killing was done during the commission of, the attempt to commit, *and* the flight from the commission of a criminal discharge of a firearm into an occupied dwelling. The record clearly shows, and Burnett does not dispute,

that sufficient evidence was presented establishing one of the factual circumstances—that Larks was killed during the commission of the underlying felony.

## THE ADMISSION OF BURNETT'S LETTERS

Burnett next challenges the denial of his motion to suppress evidence obtained by law enforcement through their inspection of nonprivileged letters that Burnett sent to Dickson while incarcerated in the county jail. The record indicates that prior to Dickson receiving the letters, jail personnel opened and photocopied the letters and sent the copies to the district attorney's office. Burnett asserts that the opening of these letters constituted a search in violation of the Fourth Amendment to the United States Constitution.

"When reviewing a district court ruling on a motion to suppress a confession, an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence." *State v. Ransom*, 288 Kan. 697, Syl. ¶ 1, 207 P.3d 208 (2009).

### Applicable Facts

Prior to Burnett's first trial, he filed a pro se motion asking the district court to suppress copies of the letters he placed in the jail's outgoing mail to Dickson. He alleged that the letters were contained in sealed envelopes and that jail personnel opened the envelopes, read and copied the letters, and then provided the copies to the prosecutor's office. Though Burnett conceded that the detention center "reserves the right to monitor incoming/outgoing mail for threats, escape plots, and other security concerns," he argued that "the jail cannot act as a liaison for the district attorney's office in the prosecution of defendant on his current charge." He argued that because no search warrant was obtained allowing jail staff to open his outgoing mail, the contents of his letters should be inadmissible at trial.

At a pretrial hearing on the motion, defense counsel conceded that when inmates are booked into the jail, they sign a statement putting them on notice that the Wyandotte County Sheriff's De-

partment may open and read their mail. He argued, however, that the statement was insufficient to put an inmate on notice that a letter could be copied and shared with the district attorney's office. Defense counsel argued that because the letters did not contain any admissions by Burnett, they lacked probative value.

The State responded by arguing that the letters had probative value because within the letters, Burnett was asking Dickson to testify in such a way that would be beneficial to his defense while being contrary to what she had already told detectives. With regard to whether the letters were obtained illegally, the prosecutor maintained that because Burnett was on notice that his nonprivileged mail could be read, the letters could be properly introduced into evidence at trial. The district court agreed, concluding that Burnett's constitutional rights would not be violated by the State introducing the letters into evidence during its case-in-chief. Accordingly, the district court denied Burnett's motion to suppress the letters.

At trial, Burnett raised an objection prior to the letters being admitted into evidence.

*Analysis*

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Warrantless searches are presumed to be unreasonable. See *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010), *cert. denied* 563 U.S. ___ (2011); see also *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). The Fourth Amendment is not implicated, however, unless the person invoking its protection had a " 'justifiable,' " " 'reasonable,' " or " 'legitimate expectation of privacy' " that was invaded by government action. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); see also *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005) ("Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment. [Citation omitted.]").

Nearly a century ago, the United States Supreme Court held that the Fourth Amendment does not prohibit the examination of

prisoners' mail. *Stroud v. United States*, 251 U.S. 15, 21-22, 40 S. Ct. 50, 64 L. Ed. 103 (1919). In *Stroud*, letters written by a detainee were later used as evidence at trial. The Supreme Court held that there was no constitutional violation because the letters were obtained "under established practice, reasonably designed to promote the discipline of the institution." 251 U.S. at 21. "Modern cases have limited *Stroud* to situations in which prison officials have seized outgoing letters in the exercise of legitimate government interests. [Citations omitted.] Thus, *Stroud* 'still controls cases in which such seizures are prompted by reasonable justification.' [Citation omitted.]" *United States v. Whalen*, 940 F.2d 1027, 1035 (7th Cir. 1991).

"[B]ecause of their reasonable concern for prison security and inmates' diminished expectations of privacy, prison officials do not violate the constitution when they read inmates' outgoing letters." *United States v. Brown*, 878 F.2d 222, 225 (8th Cir. 1989); see also *Whalen*, 940 F.2d at 1035 ("[I]t is well established that prisons have sound reasons for reading the outgoing mail of their inmates."); *State v. Brown*, 155 Idaho 423, 434, 313 P.3d 751 (Ct. App. 2013) ("Outgoing mail may present less of a security risk than the prospect of contraband secreted in a prison cell . . . but inmate mail nevertheless raises legitimate security issues. Inmates may use outgoing mail to communicate to persons on the outside the inmates' requests, plans, and methods to smuggle contraband into the institution; to devise and direct escape strategies; to direct confederates to intimidate witnesses inside or outside of the institution; or to indirectly communicate threats, harassment, or escape plans to other inmates by using persons outside as a go between. Monitoring of inmate mail can curtail these security risks."); *State v. Telford*, 940 P.2d 522, 525 (Utah App. 1997) (concluding that jail's policy of inspecting and scanning outgoing mail is narrowly tailored and served important government interests by promoting discipline and preventing criminal acts). Furthermore, "[o]nce prison officials have a right to examine such messages, no rule requires them to close their eyes to what they discover therein." *State v. Jeffers*, 135 Ariz. 404, 661 P.2d 1105 (1983); see also *State v. McCoy*, 270 Or. 340, 347, 527 P.2d 725 (1974) (same).

In *State v. Matthews*, 217 Kan. 654, 538 P.2d 637 (1975), this court held that a defendant's Fourth Amendment rights were not violated when a letter he wrote while in jail and awaiting trial was copied by jail personnel and introduced into evidence at his trial. The letter, addressed to a woman in Kansas City, Kansas, contained several incriminating statements regarding the charges pending against him. The defendant gave the letter, contained in an un-sealed envelope, to a member of the jail staff so it could be mailed. Pursuant to jail policy—which all inmates were made aware of—the letter was read prior to being placed in the jail's outgoing mail. After reading the letter, the jail staff member showed it to a law enforcement officer who was presumably familiar with the defend-ant's case. The letter was eventually copied and placed in the mail.

In concluding that the Fourth Amendment was not violated by copying the letter and admitting it into evidence at the defendant's trial, the *Matthews* court stated:

"The . . . letter was delivered to the jailer unsealed and unstamped—a circum-stance which we believe corroborates the state's assertion that defendant knew his outgoing mail would be read. There is no evidence that defendant did not know of this procedure. Here . . . no search was involved. . . . . Since the letter was delivered to the jailer unsealed and with knowledge that it would be read, defendant has no claim of any invasion of privacy. There is no evidence of trickery or deceitful practices. Defendant voluntarily wrote the letter knowing it would be read. Under such circumstances it cannot be said that the state gained access to the contents of the letter by search and seizure." 217 Kan. at 657-58.

Like *Matthews*, other courts have looked to the policy of the institution where the detainee is held to determine whether the detainee had a reasonable expectation of privacy in his or her non-privileged, outgoing mail for Fourth Amendment purposes. See *Whalen*, 940 F.2d at 1034-35 (because defendant, pursuant to prison regulations, left his outgoing letters unsealed, he had no expectation of privacy with respect to their contents); *State v. Mar-tin*, 77 Conn. App. 778, 799-800, 825 A.2d 835 (2003) (pretrial detainee had no reasonable expectation of privacy after being in-formed mail would be read); *State v. Johnson*, 476 S.W.2d 516, 518 (Mo. 1972) (no unreasonable search or seizure occurred when letter composed by defendant while in jail and awaiting trial was

admitted into evidence; defendant knew letter would be read by jailer prior to being mailed); *State v. Wiley*, 355 N.C. 592, 603-05, 565 S.E.2d 22 (2002) (no subjective expectation of privacy when detainees are aware that their mail will be inspected); *Commonwealth v. Moore*, 928 A.2d 1092, 1099 (Pa. Super. 2007) ("Appellee . . . submitted his outgoing non-privileged correspondence to the mail room in unsealed envelopes, per prison policy. Appellee availed himself of a process that exposed his correspondence to the plain view of prison officials; therefore, society would not recognize any alleged subjective expectation of privacy as reasonable.").

Here, Burnett conceded in his pro se suppression motion that he was aware that the jail reserved "the right to monitor incoming/outgoing mail for threats, escape plots, and other security concerns," indicating that jail staff had a legitimate purpose in opening his sealed letters and that Burnett did not have a reasonable expectation that his letters would remain private. By extension, once jail staff read the letters, making them aware that Burnett was attempting to influence the testimony of a witness, it was proper for them to make copies of the letters and provide them to the prosecutor's office. See *Jeffers*, 135 Ariz. at 414; *McCoy*, 270 Or. at 347. Accordingly, we conclude that the district court did not err in denying Burnett's motion to suppress evidence gained through the inspection of his outgoing letters.

## Limiting Instructions

Next, Burnett argues that the district court erred when it did not give a limiting instruction to the jury regarding evidence indicating that Burnett had committed crimes other than the ones at issue at trial. Specifically, Burnett contends that the district court should have given a limiting instruction regarding evidence indicating that he threatened to kill Ramsey, that he threw an orange juice bottle at Dickson which hit her on the head, and that within 5 years preceding July 7, 2008, he was released from prison for a felony, which prohibited him from lawfully possessing a firearm on July 7—a fact that he stipulated to and was an essential element of the crime of criminal possession of a firearm charged in this case. See K.S.A. 21-4204(a)(3). Burnett contends that all of this evidence

constituted K.S.A. 60-455 evidence and, accordingly, the district court should have given a limiting instruction regarding the evidence pursuant to *State v. Gunby*, 282 Kan. 39, 56-57, 144 P.3d 647 (2006).

Burnett acknowledges that he did not request that the district court provide a limiting instruction regarding the evidence at issue. Furthermore, he did not object to the evidence being admitted at trial. Accordingly, review of this issue is controlled by K.S.A. 22-3414(3) and the stair-step analytical process set out in *State v. Herbel*, 296 Kan. 1101, Syl. ¶¶ 7, 8, 299 P.3d 292 (2013), and *State v. Williams*, 295 Kan. 506, 511, 286 P.3d 195 (2012); see also *State v. Breeden*, 297 Kan. 567, 582, 304 P.3d 660 (2013) (failure to object to the admission of K.S.A. 60-455[b] evidence does not waive the right to raise on appeal the issue of whether the failure to give a limiting instruction was clearly erroneous).

As *Williams* articulated, K.S.A. 22-3414(3) creates a procedural hurdle when a party does not object to the failure to give an instruction because the statute establishes a preservation rule for instruction claims on appeal. It provides, in part, that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included offense instruction, unless the giving or failure to give the instruction is clearly erroneous. If it is clearly erroneous, appellate review is not predicated upon an objection in the district court. 295 Kan. at 512-13.

To establish that the giving or failure to give an instruction was clearly erroneous, the reviewing court must determine whether there was any error at all. This requires demonstrating that giving the proposed instruction would have been both legally and factually appropriate, employing an unlimited review of the entire record. *Williams*, 295 Kan. at 515-16. And if error is found on that basis, then the court moves to a reversibility inquiry in which it assesses whether it is firmly convinced the jury would have reached a different verdict had the instruction been given. The defendant maintains the burden to establish the degree of prejudice necessary for reversal. 295 Kan. at 516.

Even if we assume without deciding that it was error not to provide a limiting instruction regarding the evidence Burnett com-

plains about, we conclude that such an error was not clearly erroneous. Consistent with our above holding—that it was harmless error for the district court to prevent Burnett from cross-examining the investigators about bullets holes from prior shootings—we are not firmly convinced that the jury, based on the evidence presented at trial, would have reached a different verdict had a limiting instruction been given.

## THE INQUIRY INTO BURNETT'S REQUEST FOR SUBSTITUTE COUNSEL

Following Burnett's first trial, which ended in a hung jury, Burnett filed a "Motion for Substitution of Counsel," in which he alleged that "a serious conflict between attorney and defendant" existed "and that communication has completely broken down." In support of these allegations, Burnett claimed that defense counsel "refused to file motions, subpoena witnesses for the defendant, avoided issues that needed to be addressed, and he disregarded any request that the defendant had that will help the defendant prepare for a fair trial." He also claimed:

"There has been a complete breakdown of communication. Request for visition [sic] only generates lies, phone calls are never answer [sic] or letters and he has constantly fail [sic] to return calls or respond to defendants [sic] letters which concerns [sic] preparing for a fair trial. As a result of [this] lack of communication, defendant has not been able to do any type of investigation nor develop a defense strategy to properly prepare for trial."

Finally, Burnett claimed that defense counsel "failed to competently represent defendant by [failing to file] important motions, refused to do research on the issues or support the motions with case law. [Defense counsel] never visited the scene, he demonstrated a lack of thoroughness by doing absolutely no investigation work, and was totally unprepared at trial."

A hearing on the motion was conducted where the following exchange occurred:

"THE COURT: We are here for a pro se motion for substitution of counsel. Mr. Burnett, you can argue your motion at this time.

"THE DEFENDANT: I would like to remove [defense counsel] due to the fact that it wadn't no type of investigation work done on my case. Not only that, throughout trials and things that was taking place, that it should have been done

by [counsel] instead of having my younger brother do investigation work that he should have took care of. Wadn't none of my witnesses subpoenaed for trial. So I didn't get to have no witnesses on my behalf for trial.

"Not only that, it's things that we discussed that he never brought up throughout trial. And then on top of it, we—we had meetings over at the jail to where what we was gonna—our strategy was gonna be. It's like he—he misplaced paperwork and stuff like that, like he was—he didn't know what—what was going on or nothing like that that we just talked about hours before. So I feel that he should be removed from my case because he's not being effective.

"THE COURT: You can be seated now. Now, you've covered everything that you think is important and that I should know?

"THE DEFENDANT: Yeah.

"THE COURT: Okay. You can be seated. Yes, sir.

"[DEFENSE COUNSEL]: Your Honor, we—I discussed with Mr. Burnett in detail all of the—the State's file. Mr. Burnett had asked that I subpoena a lot of people that I thought were probably not going to be productive or would in any way counter the State's evidence. Mr. Burnett's defense is not an alibi that he wasn't there. It was that he didn't do it. And basically Mr. Burnett thought that everybody listed in the police report should have been subpoenaed and most of those people did not have, in my opinion, testimony that would be—would tend to disprove the State's contention with regard to the allegations against Mr. Burnett.

"I believe that I was able to boil the case down to the basic contentions of the State and discuss with Mr. Burnett ways of attacking those because that would be the defense as to argue the State had not shown or does not have evidence beyond a reasonable doubt to convince a jury that Mr. Burnett did the acts alleged. I tried it the way I thought it needed to be tried.

"But obviously there was some—there was some times prior to trial that Mr. Burnett complained that I wasn't up seeing him enough and for at least the month before trial, you know, I was up there on weekends. I was up there on evenings, devoted nothing pretty much but to this case about a week or so before trial in final preparation. You know, unfortunately, I've got other things I also have to schedule. I thought that I had given it sufficient attention.

"Mr. Burnett is—appears to be so shaken in my confidence to try this case a second time, I don't know whether I can rehabilitate that. I've tried during the first trial to do that and evidently have failed to do that.

"With regard to investigation, you know, I talked to the witnesses that I—I even talked to the State's witness—main witness, Simone Dickson before trial. You know, I thought I had done everything I could do to prepare for this case. And it appears that if the Court were to require me to try it again, that, you know, I think that Mr. Burnett just has no absolute—no confidence in my ability to try the case. It's sad that that happens, but it does happen. You know, people I get along fine with. Sometimes they come along that you don't. But I know it's not a

matter of getting along. It's a matter of communicating and I thought that I did my best to do that.

"This case is set as a second up trial I believe it's the 13th of October and it's set behind a case that I know is gonna go because I'm trying it. That's Mr. Rodriguez's case. So, you know, even between now and then, I've got Mr. Rodriguez and the week before, I've got a first degree murder in Division 8. I've got a rape trial a week from Monday in Division 8. So, you know, I had not planned on spending a lot of time preparing for the retrial of Mr. Burnett's case on the 13th 'cause I'm 99.9 percent confident that that case is not—this case is not gonna go on that date because of the Rodriguez trial.

"So I—I'll be honest, I haven't seen him since the last trial because I've got other things and—

"THE COURT: Well, I appreciate what the both of you have told me and, in fact, I recall this particular case. The first trial resulted in a hung jury and mistrial as I recall, which means somebody was doing something right on the defense side. Obviously, the defendant was not convicted.

"You know, Mr. Burnett, based upon what your attorney has told me and based upon my witnessing the first trial, there's no merit to any of your arguments whatsoever. You're not an attorney. You don't have a law degree. I don't know how many first degree murder trials you've defended in your past—

"THE DEFENDANT: That don't stop common sense either.

"THE COURT: I'm sorry, I can't hear you.

"THE DEFENDANT: I said that don't stop common sense either, though.

"THE COURT: Well, I understand what you're saying, but based upon my observation of [defense counsel's] performance in the first trial, based upon what you are alleging are his deficiencies, I can't find anything of a specific nature that he hasn't done on your behalf that would benefit your case. Just because you think there's something that should be done doesn't necessarily mean from a legal standpoint that it needs to be done.

. . . .

"You haven't given me any legal reason to remove him. Now, if you choose not to communicate or cooperate with him, I can't make you do that. That's entirely up to you. But obviously based upon the results of the first trial, he obviously was doing something right because the State obviously was not able to present enough evidence to convince twelve reasonable people that you were guilty of the charges you were—you were charged with.

"So the investigation argument, not witnesses argument, and the strategy argument, frankly, based upon what you've told me and what is in your motion and based upon what I've seen and heard during the trial, I—I, frankly, find that you have not met the legal threshold to remove [defense counsel] as your counsel in this case and your motion for substitution of counsel is denied."

On appeal, Burnett argues that the district court's failure to conduct any further inquiry or investigation upon his notice of dissat-

isfaction with defense counsel violated his right to counsel under the Sixth Amendment to the United States Constitution. Generally a district judge's refusal to appoint new counsel is reviewed under an abuse of discretion standard. *State v. Sappington*, 285 Kan. 158, Syl. ¶ 4, 169 P.3d 1096 (2007). Judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). The burden of demonstrating error is on the party alleging the abuse. *State v. Hulett*, 293 Kan. 312, 318, 263 P.3d 153 (2011); *State v. White*, 284 Kan. 333, 342, 161 P.3d 208 (2007).

The Sixth Amendment guarantees an indigent criminal defendant the right to the assistance of counsel in his or her criminal defense. However, such a defendant cannot compel the district court to appoint the counsel of defendant's choice. To warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with his or her appointed counsel. *State v. Bryant*, 285 Kan. 970, 986-87, 179 P.3d 1122 (2008); *State v. Hegwood*, 256 Kan. 901, 903, 888 P.2d 856 (1995). Justifiable dissatisfaction may be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant. 285 Kan. at 986. " ' "[A]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel." ' " 285 Kan. at 986-87 (quoting *State v. Ferguson*, 254 Kan. 62, 70, 864 P.2d 693 [1993]).

Contrary to Burnett's characterization, once the district court was made aware of Burnett's complaints of defense counsel, it conducted a hearing and inquired into the basis for his allegations that "a serious conflict" existed between him and defense counsel and that communications between them had "completely broken down." But Burnett's statement at the hearing did not establish either of these two claims. In fact, in Burnett's statement to the court, he noted that he had discussed his case with defense counsel,

and defense counsel noted that he had visited Burnett on numerous occasions prior to trial to discuss his case.

Based on Burnett's and defense counsel's statements at the hearing, it appears that Burnett's dissatisfaction with defense counsel stemmed from defense counsel's refusal to investigate matters or to call witnesses which Burnett deemed important but, in defense counsel's professional judgment, would not be beneficial to or advance Burnett's defense at trial.

This case is similar to *State v. Jasper*, 269 Kan. 649, 8 P.3d 708 (2000), where the defendant sought the appointment of new counsel due to current counsel being unable to find witnesses or experts to testify on her behalf at trial. At a hearing, defense counsel stated that he had made inquiries but had been unable to obtain an expert witness that would testify favorably for the defendant. In his efforts to obtain an expert witness, defense counsel had contacted medical experts and provided them with the medical records as well as the testimony given at the preliminary hearing. None of the experts were willing to testify within the required degree of medical certainty favorable to the defendant. The district court denied the defendant's request for new counsel.

On appeal, this court concluded that the district court did not abuse its discretion in denying the defendant's request for new counsel. In reaching this conclusion, the *Jasper* court stated:

"[The defendant's] letters to the trial court do not allege a conflict of interest or a complete breakdown in communications. The essence of [the defendant's] complaint was that her court-appointed counsel found no witnesses or doctors to testify in her favor at trial. The trial court reviewed the allegation. Counsel explained that he had sought experts to testify on [the defendant's] behalf, but could find none. Clearly, [the defendant's] dissatisfaction with her appointed counsel was based on counsel's inability to produce evidence that would exonerate [the defendant]. It was unfortunate for [the defendant], but the evidence she desired could not be produced because counsel could not find an expert who would testify on her behalf.

"Her complaint is not an irreconcilable conflict that could be remedied by the appointment of new counsel. Therefore, [the defendant] has failed to demonstrate a justifiable dissatisfaction with her court-appointed counsel." *Jasper*, 269 Kan. at 654-55.

Similarly, Burnett's statement at the hearing concerning defense counsel's actions or inactions does not rise to the level of alleging

a conflict of interest or a complete breakdown in communication requiring the district court to inquire further. His statement also did not allege an irreconcilable conflict because there is nothing to indicate that Burnett's dissatisfaction would have been alleviated by new counsel. Defense counsel's explanation for his actions appears to be sound, and there is nothing to indicate that a new attorney would not likewise engage in a similar course of conduct.

Accordingly, we conclude that because Burnett's statement at the hearing implicated none of the grounds warranting further inquiry—let alone warranting substitute counsel—the district court was under no duty to inquire further and did not abuse its discretion in refusing to appoint new counsel. See *State v. Richardson*, 256 Kan. 69, 81-82, 883 P.2d 1107 (1994) (denial of motion for new counsel during sentencing phase not abuse of discretion; defendant had opportunity to explain dissatisfaction; court stated reasons why defendant's concerns baseless; communication between defendant, counsel not broken down entirely).

## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

After the jury found Burnett guilty of the charged crimes, he filed a motion for a new trial in which he alleged a claim of ineffective assistance of counsel based on several alleged deficiencies. The district court allowed defense counsel, Zimmerman, to withdraw and appointed new counsel for Burnett. Subsequently, new counsel filed a memorandum in support of Burnett's motion for a new trial. More than a year after the conclusion of the jury trial, a hearing on the motion was conducted where Zimmerman testified on behalf of the State. Burnett did not present any evidence in support of his motion. After hearing testimony from Zimmerman and arguments from the parties, the district court concluded that Burnett had failed to show that Zimmerman's actions in representing him were deficient. Accordingly, the district court denied Burnett's motion for a new trial based on ineffective assistance of counsel.

On appeal, Burnett contends that the district court erred in concluding that he failed to establish ineffective assistance on the part of Zimmerman. Though Burnett raised numerous examples of

Zimmerman's deficient conduct in filings with the district court, on appeal, Burnett claims that Zimmerman rendered ineffective assistance by (1) failing to hire an investigator until a few days before the second trial; (2) failing to have other people from Frosty Treats testify so as to controvert Murphy's claim that he trained Burnett on July 7, 2008; (3) failing to have at trial a copy of Burnett's phone log; and (4) failing to have at trial a transcript of Burnett's interview with Detective Block. Each of these claims will be addressed in turn.

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law requiring de novo review. Consequently, appellate courts review the underlying factual findings for support by substantial competent evidence and the legal conclusions based on those facts de novo. *State v. Cheatham*, 296 Kan. 417, 430, 292 P.3d 318 (2013).

To establish ineffective assistance of counsel, the defendant must establish (1) that counsel's performance was constitutionally deficient, which requires a showing that counsel made errors so serious that his or her performance was less than that guaranteed by the Sixth Amendment to the United States Constitution, and (2) that counsel's deficient performance prejudiced the defense, which requires a showing that counsel's errors were so severe as to deprive the defendant of a fair trial. *Cheatham*, 296 Kan. at 431.

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Cheatham*, 296 Kan. at 431.

*Analysis*

A. *Delay in Hiring an Investigator*

Burnett contends that Zimmerman waited to obtain an investigator until just prior to the second trial. Burnett claims that this delay caused the investigator to be unable to locate a child witness who had provided a description of the shooter to the police. Burnett argues that "[a]n investigator with more time to work could have produced a different result and obtained service upon the witness."

During Burnett's jury trial, Zimmerman told the court that based on his review of a police report, E.M. (d.o.b. 1/15/02) reported hearing five gunshots on July 7 and seeing a 5'5", skinny, black male running east after the shots were fired. Zimmerman stated that he and the State had issued subpoenas for E.M. but neither party had been able to obtain service on E.M. Zimmerman said that his investigator had gone to E.M.'s address numerous times and no one would answer the door. Zimmerman believed E.M.'s description of the person he saw running from the scene was "vital evidence" because Burnett did "not meet description of 5'5" and skinny." Accordingly, Zimmerman asked the district court to allow him to present the evidence through the testimony of the officer who took down E.M.'s statement. The State objected to Zimmerman's request, arguing that the evidence constituted inadmissible hearsay evidence. The district court agreed with the State and sustained the objection.

In the memorandum filed in support of Burnett's pro se motion for a new trial, counsel wrote: "[Zimmerman] only requested a private investigator a short time prior to trial and the witnesses were not able to be located. There was a young boy that described the shooter to the police, and this description was completely inconsistent with a description of the defendant."

At the hearing on Burnett's motion for a new trial, the prosecutor questioned Zimmerman about his efforts to locate E.M.:

"Q. Okay. Now, let's talk about E.M., who was a child witness in this case, correct?

"A. Yes.

"Q. All right. And did you attempt to locate E.M.?

"A. I did.

"Q. Were you able to successfully find him?

"A. No.

"Q. Did [the investigator] attempt to locate him?

"A. I believe he went out and tried to—we had an address and I believe he went out to try to locate somebody and was unable to get anybody to answer the door.

"Q. Okay. And throughout this trial, I assume you had contact—constant contact with the prosecutor . . . is that correct?

"A. I believe so, yes.

"Q. Okay. And what—what was [the prosecutor]—do you know if she attempted to have E.M. testify for the State?

"A. I don't know. I—she told me that she had made attempts to get him subpoenaed and that his mother was uncooperative.

"Q. Okay. And did E.M. ever testify—

"A. No.

"Q.—for the State?

"A. (Shaking head side to side)

"Q. Okay. So did you ever find him?

"A. No. I tried to get his testimony in through another source and that was the patrolman that did the canvas of the area that actually wrote the report that—that set out what the—what the child had told him with regard to a description.

"Q. So you tried to do that through another officer?

"A. Right.

"Q. And how did the Court rule?

"A. I can't remember the officer's name, but I had him subpoenaed and he did come to court and we had a brief hearing with regard to his ability to testify.

"Q. And was he—the officer able to testify as to what another witness told him if that witness was not gonna be here?

"A. No. I believe his testimony was limited to the point where he wouldn't be able to testify."

No further evidence regarding Zimmerman's efforts to locate E.M. was presented at the hearing.

Though E.M.'s testimony may have been beneficial to Burnett's defense, there is nothing in the record to suggest that if Zimmerman had secured the services of an investigator sooner, that investigator would have been able to obtain service upon E.M. and that, in turn, a parent or guardian would have brought E.M. to testify at Burnett's trial. The fact that E.M. did not testify at the hearing on Burnett's motion for a new trial—occurring more than a year after the conclusion of his second jury trial—indicates that Zim-

merman's delay in hiring an investigator had little, if any, effect on whether E.M. testified at Burnett's trial.

### B. *Witnesses from Frosty Treats*

Burnett contends that other people who worked at Frosty Treats could have controverted Murphy's claim that he trained Burnett on July 7, 2008, which, in turn, would have impugned Murphy's claim that he saw a gun underneath the driver's seat of Burnett's work truck on July 7. He argues that Burnett rendered deficient performance by failing to have these people testify at trial.

However, Burnett did not present any evidence at the hearing to indicate that such witnesses existed. We therefore conclude that Burnett failed to establish that Zimmerman rendered ineffective assistance of counsel based on this allegation.

### C. *The Phone Log*

Burnett contends that Zimmerman did not have copies at trial of Burnett's phone log. Burnett does not explain how failing to have a copy of the phone log hurt Zimmerman's representation of him at trial. Consequently, we conclude that Burnett failed to establish that Zimmerman rendered ineffective assistance of counsel based on this allegation.

### D. *Transcript of the Interview*

With regard to the transcript of the interview, Burnett suggests that having a transcript ready at trial would have aided Zimmerman in cross-examining Block. As a result of not having the transcript, Burnett alleges that Zimmerman's cross-examination of Block was inadequate.

At the hearing, Zimmerman stated that he did not have a transcript of Burnett's interview with Block at the time of the second hearing. Counsel for Burnett proceeded to question Zimmerman about his cross-examination of Block:

"Q. Okay. When you were requesting that the Court allow you to play the video, was that—was it your concern to play the whole video for the Court—or for the jury or simply to be able to cross-examine with specific sentences in there?

"A. I know at the first trial, my intention was to try to get the whole thing played. At the second trial, I—it sure would have been just to clarify some of the

things that Detective Block said, oh, I don't know, I'm not sure, but I think and then began to paraphrase.

"Q. Do you recall [Detective Block] making statements that were incorrect as far as what was shown in the video?

"A. I wouldn't say incorrect, but maybe not complete. I mean, I make a distinction there. I can't say that they were completely opposite of what had been said, but perhaps they weren't put the same way or correctly.

"Q. And there clearly weren't direct quotes—

"A. Correct.

"Q.—from Mr. Burnett?

"A. Correct.

"Q. Had you had a transcription of that statement, do you feel that you would have been able to more effectively cross-examine Detective Block?

"A. Sure.

. . . .

"Q. And obviously, the defendant's statement, whether it came in—was coming in through Detective Block would have been pretty important, correct?

"A. Correct.

"Q. Do you feel that had you been able to more effectively cross-examine Detective Block, the outcome may have been different in this trial?

"A. I can't say. And only because the—the—the defense didn't hinge on Detective Block because there was nothing he was saying that—there wasn't any culpatory statements that he was trying to pin on Mr. Burnett. So I can't tell you what the outcome would have been. I mean, I suppose if [the jury] had found some reason to—to disbelieve Detective Block, they could have made an inference that perhaps they did lean too heavily on [Dickson] and overcome her somehow. But I don't know that—how that would have affected it."

Zimmerman's testimony at the hearing indicates that a transcript of the interview might have helped on cross-examination to clarify some of Block's testimony regarding the statements Burnett made at the interview, but Burnett has failed to show how doing so would have changed the outcome of his trial. Like Zimmerman at the hearing, Burnett has failed to identify any instances in Block's testimony that were contrary to what was said at the interview. Accordingly, even if we assume that Zimmerman was deficient in failing to have a transcript of the interview ready to use at trial, Burnett has failed to show prejudice, *i.e.*, how questioning Block with the transcript would have hurt Block's credibility to such an extent that the jury would have rendered a different verdict.

We conclude that Burnett has failed to show that Zimmerman rendered ineffective assistance of counsel. As a result, we affirm

the district court's decision to deny Burnett's motion for a new trial.

## CUMULATIVE ERROR

Finally, Burnett asserts that even if the issues that he has raised do not rise to the level of reversible error individually, the cumulative effect of these errors operated to deny him a fair trial, requiring reversal of his convictions.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *Thompson v. State*, 293 Kan. 704, 721, 270 P.3d 1089 (2011).

In our analysis of the issues, we have found one error (preventing Burnett from questioning investigators about other bullet holes) and assumed without deciding the presence of another error (the failure to give a limiting instruction regarding other crimes or civil wrongs evidence). But we concluded that these errors, when considered individually, were not reversible. Considering the errors collectively, we conclude that they did not aggregate so as to deny Burnett a fair trial. We reach this conclusion based on the errors being unrelated to each other and the evidence presented at trial, which included Dickson's testimony claiming that Burnett admitted to shooting at Ramsey's house and the letters Burnett wrote to Dickson, asking her to commit perjury by claiming that he never called her and claimed responsibility for the shooting.

In light of the record as a whole, we conclude there is not a reasonable probability the combined errors affected the outcome of the trial.

Affirmed.