NOT DESIGNATED FOR PUBLICATION

No. 125,111

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of G.P.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Opinion filed December 23, 2022. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant.

*Ashley Hutton*, assistant county attorney, *Todd Thompson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and CLINE, JJ.

PER CURIAM: The district court terminated parental rights over G.P. following a three-day hearing where the State presented evidence that Mother had a serious, ongoing substance abuse problem and lived in hazardous housing. Mother seeks to reverse the termination on appeal for two reasons: (1) She contends the district court wrongly denied her motion for a continuance to retain private counsel to replace appointed counsel and (2) she contends clear and convincing evidence does not support the district court's findings of her parental unfitness. Finding no error, we affirm.

FACTS

G.P. is an only child who was born in November 2015. When Mother became pregnant with G.P., her parents (Grandparents) invited her and Father to live in a berm house, which Grandparents built on the same lot as their own home.

In early spring of 2019 during a traffic stop, law enforcement arrested Mother on an active Nevada warrant for driving under the influence. Once in jail, Mother told law enforcement she had information about an ongoing murder investigation. Mother claimed she had been asked to burn bloody clothing involved in the murder, but she kept the clothing instead.

Law enforcement then took her to retrieve this evidence from Grandparents' property on April 4, 2019. But once they arrived, Mother admitted she lied about keeping the evidence because she wanted to see G.P., who was in Grandparents' care, once more before being extradited to Nevada. And while they were on the property, Mother let law enforcement inside the berm house, which they discovered was filthy. They found that along with two dogs, Mother had a 300-pound pot belly pig living inside the house. Most significantly, they found what appeared to be heroin, methamphetamine, loose pills, marijuana residue, syringes, and other drug paraphernalia throughout the house, in plain view, and in areas within a child's reach. Also, a later search of Mother's Facebook messages revealed (1) Mother bought and sold drugs online and (2) Mother bought and sold drugs while G.P. was in the car with her.

After resolving her legal issues in Nevada, Mother returned to Kansas and Grandparents returned G.P. to Mother and Father's care on July 4, 2019. The next day, the State petitioned the district court to find G.P. as a child in need of care. Citing law enforcement's earlier discoveries about Mother's and Father's drug use, drug dealing, and poor living conditions, the State argued Mother and Father failed to give G.P. adequate

parental care, control, or subsistence as stated under K.S.A. 38-2202(d)(1). For these same reasons, the State also argued Mother and Father failed to give G.P. the care and control necessary for G.P.'s physical, mental, or emotional health as stated under K.S.A. 38-2202(d)(2).

Before G.P.'s adjudication hearing, the district court appointed a guardian ad litem (GAL) to represent G.P. It also appointed counsel to represent Mother, who was indigent.

At G.P.'s adjudication hearing on August 13, 2019, Mother and Father did not contest that G.P. was a child in need of care as alleged in the State's petition. Afterward, the district court ordered the Kansas Department for Children and Families (DCF) to complete a report on G.P.'s "best placement" options. Until then, G.P. would remain in Mother's and Father's care and custody.

Several days later, a DCF social worker interviewed Mother and Father. During her interview, Mother claimed the drugs and drug paraphernalia found by law enforcement in the berm house belonged to a friend. Also, although both admitted to using drugs in the past, Mother and Father told the social worker they no longer did. But when asked to take drug tests, they delayed taking the tests for seven days. Ultimately, Mother's urinalysis test (UA) results revealed she had consumed alcohol while Father's UA test results showed he was positive for amphetamines and methamphetamines.

On August 28, 2019, the State moved to remove G.P. from Mother's and Father's care and custody based on DCF's report on G.P.'s best placement options. In that report, the DCF social worker said it was in G.P.'s best interests to be placed outside of Mother and Father's home given their apparent ongoing drug issues.

That same day, the district court granted the State's motion. It determined G.P. was likely to sustain harm if not removed from Mother and Father's care and custody. In turn,

3

it ordered DCF to take custody of G.P. But at the same time, it determined G.P.'s best interests was to remain with family. So, upon their request, it ordered G.P. be placed with Grandparents. Thus, although Mother and Father continued to live in the berm house on Grandparents' property, the district court ordered G.P. to live with Grandparents in their main house.

After G.P. entered DCF's custody, Mother started working with Cornerstones of Care—a private agency contracting with DCF to provide family preservation services—to regain custody of G.P. At her initial case planning conference on October 1, 2019, the court approved Mother's reintegration case plan which prohibited her from using illegal drugs and required her to submit to drug testing at Cornerstones' request. It also required her to (1) take and then follow the recommendations of a regional alcohol and drug assessment center (RADAC) test each time she failed drug testing; (2) obtain and give Cornerstones proof she had "housing with utility and lease documentation"; (3) obtain, maintain, and give Cornerstones proof of "legal stable employment"; (4) resolve all of her pending legal issues; (5) not discuss G.P.'s child in need of care (CINC) case with G.P.; (6) complete an age-appropriate parenting class; and (7) "[a]ctively participate in family therapy and follow all recommendations." As of February 11, 2020, though, Mother's reintegration case plan also required her to prove her housing was stable and hazard-free. Hazard-free meant Mother's house needed to be "free from clutter, drugs, drug paraphernalia and other hazards that would cause [G.P.] harm." And as of February 11, 2020, her case plan further required her to: (1) prove she could legally drive, (2) sign releases when requested, (3) complete background checks on all people in contact with G.P., (4) maintain monthly contact with Cornerstones, and (5) update Cornerstones if her phone number changed.

As the agency providing family preservation services, the district court ordered Cornerstones to file reports on Mother's progress in completing her reintegration case plan tasks before each hearing. In these court reports, Kristin McGlinn, the Cornerstones'

4

case manager assigned to G.P.'s CINC case, noted that Mother completed her age-appropriate parenting class on November 17, 2020. She explained Mother consistently complied with her reintegration case plan tasks to sign releases when requested, complete background checks on people in contact with G.P., maintain monthly contact with Cornerstones, and update Cornerstones when her phone number changed. But McGlinn also reported Mother consistently violated her reintegration case plan tasks relating to illegal drug use and adequate housing.

McGlinn reported that between October 1, 2019, and March 8, 2021, Mother's UA tests were positive for recent methamphetamine use on October 1, 2019, February 24, 2020, and January 21, 2021. Although Cornerstones asked her to complete UAs, Mother did not do so on January 27, 2020, October 22, 2020, December 28, 2020, February 9, 2021, February 18, 2021, and February 25, 2021. Nor did Mother complete a RADAC test until November 10, 2020, after which she did not consistently attend her outpatient therapy sessions.

Along with the failed and missed drug tests, McGlinn reported Mother tampered with two drug tests. On September 21, 2020, the person monitoring Mother's UA test found a film cartridge in the toilet Mother had used to complete her UA. The person made Mother do another UA, which results showed Mother had recently consumed methamphetamine and opiates. McGlinn believed Mother tried to use another person's urine to complete her UA. On December 1, 2020, Mother passed the court-ordered hair follicle test. But McGlinn questioned the accuracy of the test because:  (1) Mother completed the test outside of the court-ordered time, (2) Mother bleached her hair before taking the test, and (3) the negative hair follicle test result conflicted with Mother's past positive UA test results.

Mother was also twice arrested and charged with drug-related crimes during G.P.'s CINC case. On September 7, 2020, a passerby called law enforcement after seeing

Mother slumped over the steering wheel of her car, which was parked partially on pavement and partially on a grass median. Mother's preliminary breath test showed her blood alcohol level was .110 and law enforcement discovered what appeared to be burnt heroin residue on a spoon, two syringes, and a muscle relaxing pill scattered throughout Mother's car. Mother was arrested and charged with drug possession, drug paraphernalia possession, DUI, and driving on a suspended license.

Subsequently, around 6:45 p.m., on December 7, 2020, at least two drivers called law enforcement after witnessing a person, who turned out to be Mother, driving erratically on the highway. One driver reported Mother was "going in and out of the ditches, popping in and out, driving onto oncoming traffic, almost hit a minivan head on, [and] another car head on." Ultimately, Mother crashed her car into something, stopping in the middle of the highway. Then, while receiving medical treatment, a law enforcement officer discovered Mother had syringes and what appeared to be heroin inside her purse. Mother was again arrested and charged with drug possession, drug paraphernalia possession, and DUI.

Because Mother's substance abuse was a main reason G.P. was in DCF's custody, the district court made Mother's visitation with G.P. contingent on her passing her UAs. And those visits were supervised by Cornerstones or Grandparents. McGlinn reported Mother attended 26 of her 27 supervised visits with G.P. between October 11, 2019, and May 14, 2020. As for the missed visit, Mother was not allowed to attend because she did not complete a UA as requested. After Mother tampered with her September 21, 2020 UA, Cornerstones required Mother to pass two UAs in a row before visits. Although it is not entirely clear from the record on appeal, it seems that Mother missed all her supervised visits with G.P. from September 21, 2020, until February 19, 2021, because she had not passed two UAs.

As for Mother's housing, McGlinn reported Mother refused to allow a Cornerstones' staff member to conduct a safety walkthrough of the berm house on January 23, 2020. After this attempt, it seems Cornerstones' staff attempted, but could not complete, three more safety walkthroughs of Mother's housing. In any case, Grandparents ultimately told Cornerstones that Mother was no longer living in the berm house. Rather, during 2020, she had moved to Grandparents' trailer, which was parked on a different piece of property that Grandparents owned.

Besides these problems, Mother also never proved she obtained a legal job. Although Mother told McGlinn she worked part-time, she never gave McGlinn paystubs to confirm her legal employment. From October 1, 2019, to March 8, 2021, the only proof of legal income Mother gave McGlinn was invoices for some online sales. And because of Mother's new criminal charges, McGlinn alleged Mother created, rather than resolved, all pending legal issues. Also, relying on Grandparents' complaints about Mother's supervised visits with G.P., McGlinn reported Mother sometimes discussed G.P.'s CINC case with G.P. According to Grandparents, Mother sometimes told G.P.: (1) Grandparents' house was not G.P.'s home and (2) G.P. would "be living with her soon." And they told McGlinn that in January 2020, G.P. saw Mother push Grandmother so she could get inside Grandparents' house to visit G.P.

Based on Mother's ongoing problems complying with her reintegration case plan tasks the State moved to terminate Mother's parental rights on March 8, 2021. The next day, at a review hearing where Mother appeared with her appointed attorney, the district court scheduled Mother's termination hearing for May 12, 2021.

At the start of the termination hearing, Mother orally moved for a continuance so she could retain private counsel. According to Mother and her appointed attorney, Mother had spoken to private counsel the day before. But private counsel told Mother to ask for a continuance because he would not represent Mother until she gave him a retainer.

7

Although Father supported Mother's continuance motion, Grandparents strongly opposed it as merely a delay tactic. The State and the GAL also argued unless the continuance was very short or Mother could establish she really intended to retain private counsel, the district court should deny the motion. The State argued Mother's motion was too late, emphasizing that she waited to make her motion until the start of her termination hearing despite having known about the hearing since it was scheduled on March 9, 2021. The State contended G.P.'s CINC case needed to be resolved without unnecessary delay.

In the end, the district court denied Mother's motion. In doing so, it emphasized that G.P.'s CINC case had been open since July 5, 2019. It also pointed out Mother never mentioned getting new counsel before the termination hearing, which had been scheduled for over two months. It stressed that even when making her motion, Mother never complained about her appointed attorney's representation. And other than saying she intended to retain private counsel if granted the continuance, Mother provided no proof that she would do so. Like Grandparents, the district court felt Mother's motion was a delay tactic. Mother's termination hearing proceeded as scheduled.

The termination hearing took place over three days—May 12, 2021, May 27, 2021, and June 24, 2021. The State focused on Mother's encounters with law enforcement and her lack of progress in completing her reintegration case plan tasks. In response, Mother offered her own testimony discussing her reintegration case plan task progress. Although neither the GAL nor Grandparents presented any evidence, they supported termination.

The State called the law enforcement officers involved with the April 4, 2019 search of the berm house, Mother's September 7, 2020 DUI arrest, and her December 7, 2020 DUI arrest. It also called the people who contacted law enforcement because they were concerned about Mother's well-being on September 7, 2020, and December 7, 2020. And two officers testified on May 27, 2021, about Mother's most recent legal issue,

which occurred on May 12, 2021. Those officers explained that after stopping Father for a traffic violation outside the courthouse right after the termination hearing on May 12, 2021, they saw two syringes under Mother's passenger seat. During their search of Mother's purse, they found four syringes, including one syringe containing a dark substance that field tested positive for heroin.

The State called McGlinn, McGlinn's supervisor, and Grandfather to testify about Mother's reintegration case plan task progress. McGlinn generally testified the district court should terminate Mother's parental rights based on the information she outlined in the Cornerstones court reports. She explained she does not believe Mother will stop using illegal drugs in the foreseeable future because Mother denied she had a substance abuse issue. She noted that although Mother completed RADAC testing, Mother had not consistently followed through with the test recommendation to participate in outpatient individual and group therapy. McGlinn also worried about the effect of Mother's relationship with Father on G.P. because they often separated, with Mother sometimes citing Father's drug use as the reason for their separation.

As for Mother's housing, McGlinn's supervisor explained Mother's current housing concerned Cornerstones because Mother never allowed Cornerstones to complete a safety walkthrough of the trailer. And Grandfather testified that when he entered the trailer after Mother's May 12, 2021 arrest, it was no longer livable. Grandfather's photos of the trailer were admitted into evidence, and he testified about syringes he discovered in several places as well as a spoon containing a dark burnt substance. When asked if he believed Mother would ever stop using illegal drugs, Grandfather explained he did not believe so because Mother had been dealing with a substance abuse problem for about 20 years. He also noted when he entered the trailer after Mother's May 12, 2021 arrest, Mother had two adult dogs, three adult cats, and three separate litters of kittens living inside it.

Upon her request, the district court allowed Mother to give a narrative direct examination over the State's objection. During this narrative, Mother admitted some of the State's evidence supporting termination was "true." But she asserted not all the State's evidence was "accurate." She alleged G.P.'s needs were always met in her care. And she claimed she had "done everything requested of [her] and more." Mother disputed the accuracy of McGlinn's reporting of her UA test results, but she admitted she had used illegal drugs during G.P.'s CINC case—although she claimed she had only one relapse that involved heroin around June 2020. As for the syringes and drug paraphernalia found in her home and purse, she claimed these were either from her prior drug use or that they belonged to a friend who used drugs and sometimes stayed at the house.

After taking the matter under advisement, the district court ultimately terminated Mother's parental rights over G.P. In doing so, the court explicitly found the State's witnesses' testimony credible or credible "as a whole," incorporating the State's witnesses' testimony into its findings of fact. In contrast, it found Mother's testimony "wholly incredible and unreliable." The district court stressed that G.P. had been in DCF custody while placed with Grandparents since August 2019, meaning G.P. was in DCF custody for about 20 months before the State moved to terminate Mother's parental rights. It stressed that it approved Mother's initial reintegration case plan tasks, including the tasks about illegal drug use, on October 1, 2019.

The district court determined Mother was presumptively unfit under K.S.A. 38-2271(a)(5) because G.P. had been out-of-home placement for more than 12 months and Mother substantially neglected or willfully refused to complete the following reasonable court-approved reintegration case plan tasks: (1) to not use illegal drugs, (2) to complete drug testing whenever Cornerstones requested, (3) to complete and follow the recommendations of a RADAC test after testing positive for illegal drugs, (4) to obtain and give Cornerstones proof of hazard-free housing with utilities, (5) to obtain and give Cornerstones proof of "stable legal employment," (6) to resolve all pending legal issues,

(7) to prove she could legally drive, (8) to not discuss G.P.'s CINC case in front of G.P., and (9) to actively participate in family therapy. Because it further found Mother failed to rebut this presumption of unfitness, the district court terminated Mother's parental rights over G.P. under K.S.A. 38-2271(b).

Besides this presumptive unfitness ruling, the district court found clear and convincing evidence of Mother's parental unfitness because: (1) Mother's ongoing substance abuse problems prevented her from caring for G.P.'s needs as stated under K.S.A. 38-2269(b)(3); (2) Mother's ongoing substance abuse problems caused Cornerstones' reasonable efforts to rehabilitate the family to fail as stated under K.S.A. 38-2269(b)(7); (3) Mother's ongoing substance abuse problems and hazardous home conditions supported her failure to adjust her circumstances to G.P.'s needs as stated under K.S.A. 38-2269(b)(8); and (4) based on the length of the case, Mother's failure to support G.P. financially, and Mother's failure to carry out her reasonable court-approved reintegration case plan as stated under K.S.A. 38-2269(b)(9), (c)(3), and (c)(4). Then, the district court found there was clear and convincing evidence that (1) Mother would not adjust her circumstances to become fit to parent G.P. in the foreseeable future and (2) it was G.P.'s best interests to terminate Mother's parental rights. In doing so, the district court emphasized the length of G.P.'s case, G.P.'s young age, G.P.'s need for permanency, Mother's general failure to complete her reintegration case plain tasks, Mother's substance abuse struggles, and Mother's refusal to "even admit" she had a substance abuse problem.

ANALYSIS

*Did the district court err by denying Mother's continuance motion?*

Under K.S.A. 38-2246, CINC cases must "be disposed of without unnecessary delay." As a result, the district court cannot grant a continuance "unless good cause is

11

shown." Additionally, under K.S.A. 38-2267(a), the district court should not grant a motion to continue a termination hearing unless it "finds it is in the best interests of the child." When reviewing the district court's denial of a continuance motion, this court reviews the district court's decision for an abuse of discretion. A district court abuses its discretion if it commits an error of law, commits an error of fact, or makes an otherwise unreasonable decision. *In re J.A.H.*, 285 Kan. 375, 384, 172 P.3d 1 (2007); *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

Because a parent has a fundamental liberty interest to decide the care, custody, and control of his or her child, the district court's denial of a parent's continuance motion may violate that parent's due process rights under the Fourteenth Amendment to the United States Constitution. See *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007). On the other hand, the State has an interest in the welfare of children. 284 Kan. at 166. Previously, this court has explained the State has a heightened interest in resolving CINC cases quickly so the child has a stable home. *In re M.S.*, 56 Kan. App. 2d 1247, 1253, 447 P.3d 994 (2019). Therefore, as long as the State follows the due process of law, the State may take custody of a child from his or her parent. *In re J.D.C.*, 284 Kan. at 166. To determine whether a parent was afforded the procedural protection required, this court uses the three-factor balancing test the United States Supreme Court set out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976):

> "(1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest
> through the procedures used and the probable value, if any, of additional or substitute
> procedural safeguards; and (3) the State's interest in the procedures used, including the
> fiscal and administrative burdens that any additional or substitute procedures would
> entail." *In re J.D.C.*, 284 Kan. at 166-67.

On appeal, Mother contends the district court abused its discretion and violated her constitutional due process rights when it denied her motion to continue her termination hearing. According to Mother, although her appointed attorney represented

her throughout G.P.'s CINC case, once she told the district court she intended to retain private counsel, the district court should have granted her continuance motion. The State counters by arguing the district court correctly denied the motion because a continuance was not in G.P.'s best interests.

We find the State's position persuasive. To begin with, Mother has inadequately briefed, and thus abandoned, both her abuse of discretion argument and her due process argument. Mother never discusses whether a continuance was in G.P.'s best interests, nor does she explain why we should address her due process argument, which she raises for the first time on appeal.

When an appellant fails to adequately brief an issue, that issue is waived or abandoned. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Similarly, an appellant cannot make an argument on appeal that he or she did not first raise before the district court. *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). Although there are exceptions to this rule, under Kansas Supreme Court Rule 6.02(a)(5) (2022 Kan. S. Ct. R. 36), for an exception to apply, an appellant must explain (1) why the argument was not raised before the district court and (2) why this court should consider the argument for the first time on appeal. Moreover, because our Supreme Court strictly enforces Rule 6.02(a)(5), an appellant's failure to strictly comply with Rule 6.02(a)(5) dooms that appellant's appeal for that argument. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). By violating Rule 6.02(a)(5), the appellant abandons his or her argument through inadequate briefing. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015).

Here, by failing to even mention K.S.A. 38-2246, K.S.A. 38-2267(a), or G.P.'s best interests, Mother inadequately briefed her argument about the district court abusing its discretion. Simply put, Mother abandoned her argument by failing to discuss, let alone cite, the statutes the district court relied on to review and deny her motion. As for

13

Mother's due process argument, Mother never explains why this court should consider her argument for the first time on appeal due to some exception under Rule 6.02(a)(5).

Along with these briefing problems, both of Mother's arguments hinge on her contention that once she "indicated that she was retaining private counsel," there was a real "risk of [an] erroneous deprivation of [her parental] rights." But Mother never explains why private counsel's representation was necessary. That is, Mother never claims she needed private counsel's representation because her appointed attorney was incapable or ineffective. And she never asserts she was somehow prejudiced by her inability to hire private counsel or her ultimate representation by her appointed attorney.

"The Sixth Amendment guarantees an indigent criminal defendant the right to the assistance of counsel in his or her criminal defense." *State v. Burnett*, 300 Kan. 419, 449, 329 P.3d 1169 (2014). But the Sixth Amendment does not apply to indigent parents in CINC proceedings. *Lassiter v. Dept. of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 26, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); see *In re D.R.*, No. 119,119, 2018 WL 5851604, at *7 (Kan. App 2018) (unpublished opinion). Rather, the Due Process Clause of the Fourteenth Amendment gives an indigent parent a right to counsel in some cases. *Lassiter*, 452 U.S. at 27-28. Regardless, even in criminal cases in which the indigent defendant has a guaranteed right to counsel, our Supreme Court has held the "defendant cannot compel the district court to appoint the counsel of defendant's choice. To warrant substitute counsel, a defendant must show 'justifiable dissatisfaction' with his or her appointed counsel." *Burnett*, 300 Kan. at 449.

As stressed by the district court when denying Mother's motion, during G.P.'s CINC case, Mother never suggested her appointed attorney was somehow deficient or unprepared for her termination hearing. Instead, Mother's only argument before the district court was that she should be granted the continuance so she could hire private counsel to replace her appointed counsel. Even if this court assumed that Mother had a

14

constitutional right to counsel, Mother still needed a valid reason for wanting to hire private counsel to replace appointed attorney before the district court's denial of her continuance motion could violate her due process rights.

Likewise, under K.S.A. 38-2246, Mother needed to give the district court good cause to grant her continuance motion because CINC proceedings must be "disposed of without unnecessary delay." And under K.S.A. 38-2267(a), Mother needed to prove that a continuance was in G.P.'s best interests. Because Mother never suggested she had some justifiable dissatisfaction with her appointed attorney to support her continuance motion, she did not prove there was good cause to continue the hearing or that a continuance was in G.P.'s best interests.

Also, the district court's denial of Mother's continuance motion was reasonable given its timing. Mother's abuse of discretion argument ignores that although her termination hearing had been scheduled for about two months, she waited until the start of the hearing to orally request the continuance. It also ignores that G.P.'s CINC case had been pending about 22 months by the time Mother sought a continuance. For these reasons, we find the district court's denial of Mother's motion was reasonable.

*Did the trial court err by terminating Mother's parental rights?*

The district court terminated Mother's parental rights under K.S.A. 38-2271(a)(5) as well as K.S.A. 38-2269(b)(3), (b)(7), (b)(8), and (b)(9). Since we agree with the district court's findings under K.S.A. 38-2271, which provide a sufficient basis to terminate Mother's parental rights, we need not address the court's alternative unfitness findings under K.S.A. 38-2269. *In re D.S.*, No. 124,563, 2022 WL 12144472, at *11 (Kan. App. 2022) (unpublished opinion).

Under K.S.A. 38-2271(a)(5) the district court presumes a parent "unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes, by clear and convincing evidence" that

> "the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home."

Clear and convincing evidence is enough evidence to establish the truth of the facts asserted is "highly probable." *In re B.D.-Y.*, 286 Kan. 686, 696, 187 P.3d 594 (2008). After the district court finds a parent presumptively unfit under K.S.A. 38-2271(a)(5), the parent carries the "burden of proof . . . to rebut the presumption of unfitness by a preponderance of the evidence." K.S.A. 38-2271(b). A preponderance of the evidence is evidence that shows a fact is more probably true than not true. *In re B.D.-Y.*, 286 Kan. at 691. If the parent fails to rebut his or her presumption of unfitness, then the district court must terminate the parent's rights over the child. K.S.A. 38-2271(b).

When reviewing the district court's termination of parental rights, this court will uphold the district court's decision "if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). Also while engaging in this review, this court will not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

On appeal, Mother argues insufficient evidence supported the district court's termination of her parental rights over G.P. Highly summarized, Mother argues the district court's decision hinged on fact-findings that supported her parental unfitness

while ignoring evidence that supported her parental fitness. According to Mother, she was making adequate progress on her reintegration case plan tasks.

We find Mother's arguments unpersuasive. Clear and convincing evidence supported the district court's finding that Mother was presumptively unfit to parent G.P. as meant under K.S.A. 38-2271(a)(5) and, as a result, we affirm the district court's rulings terminating Mother's parental rights over G.P.

*Mother's Inadequate Progress Completing Her Reasonable Court-Approved Reintegration Case Plan Tasks Proved Mother was Presumptively Unfit to Parent G.P. under K.S.A. 38-2271(a)(5).*

When the State moved to terminate Mother's parental rights on March 8, 2021, nearly 19 months had passed since DCF removed G.P. from Mother's care on August 28, 2019. As a result, Mother does not dispute the district court's finding that the State proved the timing element of K.S.A. 38-2271(a)(5) by clear and convincing evidence.

Rather, Mother's argument challenging the district court's presumptive unfitness finding under K.S.A. 38-2271(a)(5) just concerns her progress completing her reintegration case plan tasks. Mother contends the district court erred when it found she substantially neglected or willfully refused to follow her reintegration case plan tasks involving no illegal drug use, safe housing, legal employment, resolving legal issues, discussing G.P.'s CINC case in front of G.P., and actively participating in family therapy. At the same time, she argues the district court wrongly ignored the evidence that she completed an age-appropriate parenting class. But there are obvious problems with each of Mother's arguments. Simply put, when considering the evidence in the light most favorable to the State, clear and convincing evidence supported the district court's termination of Mother's parental rights over G.P. under K.S.A. 38-2269(a).

17

*Substance Abuse-Related Reintegration Case Plan Tasks*

In its termination order, the district court's presumptive unfitness analysis mainly focused on Mother's substantial neglect or willful refusal to comply with the substance abuse-related reintegration case plan tasks. To support its presumptive unfitness finding, it pointed to evidence that Mother failed, missed, or tampered with many drug tests. It noted that although Mother completed a RADAC test, she waited to do so until November 10, 2020. It stressed that even then, Mother inconsistently attended outpatient individual and group therapy as recommended by the test. It cited evidence of Mother's long and ongoing history of substance abuse problems. And it emphasized the evidence that Mother continued to use illegal drugs and to give excuses for her illegal drug use.

Mother does not directly challenge the district court's findings about failing, missing, or tampering with her drug tests. Nor does she directly challenge the district court's findings about completing the RADAC test, complying with the RADAC test's recommendation, or her history of substance abuse problems. Instead, Mother argues when it evaluated her progress completing the substance abuse-related reintegration case plan tasks, the district court wrongly ignored evidence that Cornerstones never sent her drug tests to a lab for confirmation testing, that she had more negative drug tests than positive drug tests, and that her most recent drug tests were negative for drugs. She seemingly contends the district court erred when it found she substantially neglected or willfully refused to follow her substance abuse-related reintegration case plan tasks because this evidence proved that she "was still generally on track under the reunification plan."

But Mother's arguments hinge on this court reweighing the evidence in her favor. Although Mother concedes some evidence supported her continued illegal drug use in violation of her reintegration case plan task, Mother asserts her progress was adequate because some evidence also supported that she sometimes refrained from using illegal

18

drugs. But Mother's argument ignores that this court's standard of review prevents it from reweighing the evidence while requiring it to consider the evidence in the light most favorable to the State. See *In re of Adoption of Baby Girl G.*, 311 Kan. at 806. In short, because Mother's arguments about her progress completing her substance abuse-related reintegration case plan tasks all involve whether the district court gave the wrong weight to the evidence before it, her allegation that insufficient evidence supported the district court's contrary finding necessarily fails.

The record also undercuts Mother's argument about Cornerstones not sending her drug tests for confirmation testing. Mother seemingly contends the district court erred by finding she substantially neglected or willfully refused to follow her substance abuse-related reintegration case plan tasks because Cornerstones' failure to have her drug test results confirmed by lab-testing meant that her drug tests results were unreliable. She contends because the district court found some of McGlinn's testimony about her drug test results unreliable, the district court should have found all of McGlinn's testimony about her drug test results unreliable. But the fact that the district court considered some of McGlinn's testimony about Mother's drug test results reliable and some of McGlinn's testimony about Mother's drug test results unreliable establishes the district court weighed the adequacy of Cornerstones' drug testing procedures when determining whether she complied with her substance abuse-related reintegration case plan tasks.

Next, Mother's argument about the district court ignoring that she had more negative than positive drug tests is baseless. Mother's reintegration case plan task was to not use illegal drugs. Because Mother's task required her to not use any illegal drugs, Mother's submission of more negative than positive drug tests does not constitute adequate progress on her substance abuse-related reintegration case plan tasks. To constitute adequate progress on those tasks, Mother needed to consistently submit negative drug tests. Although the parties disputed the accuracy of Cornerstones' drug testing throughout G.P.'s CINC case, the evidence at Mother's termination hearing

supported that during G.P.'s CINC case, Mother's drug tests were negative for illegal drugs 28 times, positive for methamphetamine 5 times, and positive for heroin once. It also supported that Mother missed at least 21 scheduled UA tests and tampered with two drug tests. So, Mother's overall completion of more negative than positive drug tests did not prove she was making adequate progress on her substance abuse-related reintegration case plan tasks.

As for Mother's argument about her recent tests being negative for illegal drugs, Mother cites no place in the record supporting her assertion. Nor does she explain why her recent negative drug tests constituted enough progress to prevent the termination of her parental rights. So it is unclear exactly what Mother means when she contends her progress completing her substance abuse-related reintegration case plan tasks was adequate because her recent drug tests were negative. It is a well-known rule of this court that an appellant abandons any point raised incidentally in his or her brief and not argued. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017). Here, because Mother simply asserts her recent negative drug tests supported her progress completing her substance abuse-related reintegration case plan tasks without further analysis, Mother has merely raised her argument incidentally in her brief.

Yet even if this court assumed Mother adequately briefed her argument, her argument about her most recent drug tests being negative for illegal drugs ignores the evidence establishing she continued to use illegal drugs after the start of her termination hearing. On May 12, 2021, following the first day of evidence, law enforcement arrested Mother after finding her in possession of a substance that field tested positive for heroin and multiple syringes. Cornerstones' court reports also show that between the first day of Mother's termination hearing on May 12, 2021, and the day the district court terminated Mother's parental rights from the bench on August 9, 2021, Mother tested negative for illegal drugs nine times, tested positive for methamphetamine once, and missed one scheduled UA test. And Mother tested positive for methamphetamine and missed her

20

scheduled UA test after the final day of evidence at the termination hearing. Thus, despite Mother's apparent argument otherwise, her recent drug test results did not support her adequate progress completing her substance abuse-related reintegration case plan tasks.

Finally, Mother's general argument why the district court erred by finding she substantially neglected or willfully refused to follow her substance abuse-related reintegration case plan tasks ignores the State's strong evidence that Mother made no progress addressing her substance abuse problem during G.P.'s CINC case. Again, the State opened G.P.'s CINC case after law enforcement discovered what appeared to be heroin, methamphetamine, loose pills, marijuana residue, syringes, and other drug paraphernalia throughout the berm house in plain view and in areas within a child's reach. After the State opened G.P.'s CINC case on July 5, 2019, but before the State moved to terminate Mother's parental rights on March 8, 2021, Mother was arrested and charged with drug possession, drug paraphernalia possession, and DUI twice—September 7, 2020, and December 7, 2020. In both instances, law enforcement saw Mother in possession of what appeared to be heroin residue and a syringe. In both instances, witnesses reported Mother was unsafe to drive. On December 7, 2020, in particular, the witnesses of Mother's driving feared Mother might injure herself or someone else because she was driving into oncoming traffic as well as in and out of ditches before she crashed her car.

In summary, the State's evidence proves that after the State opened G.P.'s CINC case because Mother's substance abuse problems endangered G.P., Mother continued to use illegal drugs and made little progress on the substance abuse case plan tasks throughout G.P.'s CINC case. As a result, the district court correctly found Mother substantially neglected or willfully refused to follow her substance abuse-related reintegration case plan tasks.

*Safe Housing Reintegration Case Plan Tasks*

In its termination order, the district court found Mother substantially neglected or willfully refused to follow her housing-related reintegration case plan tasks because Grandfather's testimony about the trailer's condition following Mother's May 12, 2021 arrest established the trailer was unsuitable. It explained Grandfather's testimony and photos of the trailer proved the trailer was full of "clutter," "filth," and "all types of drug paraphernalia." It also found Mother substantially neglected or willfully refused to comply with her housing reintegration case plan tasks because Mother never allowed Cornerstones' staff to complete a safety walkthrough of her housing.

Mother argues the district court erred because it relied on McGlinn's biased testimony against her in making this finding. But Mother's argument conveniently ignores that when terminating her parental rights from the bench, the district court explained its primary concern when reviewing Mother's progress completing her housing reintegration case plan tasks was "whether or not the housing was appropriate." Plus, even assuming McGlinn was biased against Mother, Grandfather found the spoon containing heroin-like residue and syringes inside the trailer following Mother's arrest after the first day of her termination hearing.

As the district court noted when finding Mother substantially neglected or willfully refused to complete her housing reintegration case plan tasks, the State opened G.P.'s CINC case on July 5, 2019, partly because of Mother's hazardous housing containing drugs and drug paraphernalia. Nearly two years later, after her termination hearing was already underway, Mother's housing still contained drugs, drug paraphernalia, and multiple neglected animals. Because the evidence proves Mother made no progress completing her housing reintegration case plan tasks, the district court correctly found Mother substantially neglected or willfully refused to complete these case plan tasks.

*Legal Employment Reintegration Case Plan Task*

The district court approved Mother's reintegration case plan task to obtain, maintain, and provide Cornerstones proof of "legal stable employment" at her initial case planning conference on October 1, 2019. In its termination order, the district court found Mother never gave Cornerstones proof of her legal stable employment. Although the district court never explicitly found Mother substantially neglected or willfully refused this task, it implicitly did so by finding Mother never gave Cornerstones proof of her employment during G.P.'s CINC case.

Mother contends the district court's finding was unfair because she testified she gave McGlinn some paystubs that proved her legal employment. She also asserts her work buying and selling items online should have constituted legal stable employment.

But Mother's argument ignores that McGlinn testified Mother never provided Cornerstones with proof of legal stable employment. Although the district court found some of McGlinn's testimony unreliable, it "found other parts of [her] testimony to be credible." Because the district court found Mother never provided Cornerstones documentation of her legal stable employment, it follows that the district court found McGlinn's testimony about Mother not satisfying her employment reintegration case plan task requirement credible. On top of this, the district court found Mother's testimony "wholly incredible and unreliable." Thus, Mother's argument citing her own testimony as evidence the district court was wrong would require that we reverse the district court's credibility determination which would be contrary to our standard of review. *In re Adoption of Baby Girl G.*, 311 Kan. at 806.

Also, there are obvious problems with Mother's assertion that her work buying and selling items online should have constituted legal stable employment. For starters, according to McGlinn, Mother did give her some invoices from selling items online

during G.P.'s CINC case. Yet, McGlinn's testimony shows Mother was not giving her evidence of consistent online sales equivalent to a legal job that would provide Mother the financial stability needed to care for a child. And perhaps most importantly, Mother's argument ignores that her case plan required her to obtain, maintain, and provide proof of "legal stable employment" because of her prior illegal online transactions. Again, after law enforcement discovered the drugs and drug paraphernalia in the berm house on April 4, 2019, they discovered Mother was using Facebook Messenger to setup drug buys and drug sales in her car and in G.P.'s presence. When petitioning the district court to find G.P. a child in need of care, the State asserted G.P. might sustain harm because of Mother's drug dealing business. Thus, Mother had the reintegration case plan task to obtain, maintain, and provide proof of legal stable employment because she had put G.P. at risk through her online drug buys and sales.

As a result, Mother's arguments why the district court wrongly found she substantially neglected or willfully refused to follow her reintegration case plan task on legal stable employment are unpersuasive.

*Resolving Legal Issues Reintegration Case Plan Task*

The district court approved Mother's reintegration case plan task to resolve all legal issues at her initial case planning conference on October 1, 2019. In its termination order, the district court seemingly found Mother substantially neglected or willfully refused to follow this reintegration case plan task because although Mother "resolved her legal issues that were pending at the beginning of [G.P.'s CINC] case, during the case she has been arrested for driving under the influence twice."

Mother argues because she resolved the legal issues that were pending at the start of G.P.'s CINC case, she complied with the plain language of her reintegration case plan task. As for her new criminal charges, Mother asserts she has not been convicted of those

24

crimes. She suggests that because she has not been convicted of those crimes, the district court should not have considered her new charges in evaluating her compliance with her reintegration case plan tasks.

But Mother's argument ignores that this task required her to "resolve all pending legal issues" in G.P.'s entire CINC case. So, Mother's obligation to resolve all pending legal issues was an ongoing task that she needed to follow during G.P.'s entire CINC case. Thus, after Mother was charged with drug possession, drug paraphernalia possession, and DUI following her September 7, 2020 and December 7, 2020 arrests, Mother needed to resolve those pending legal issues. In turn, Mother's new criminal charges constituted clear and convincing evidence supporting the district court's finding that Mother substantially neglected or willfully refused to complete her reintegration case plan task to resolve all pending legal issues.

*Discussing G.P.'s CINC Case Reintegration Case Plan Task*

The district court approved Mother's reintegration case plan task to not discuss G.P.'s CINC case with G.P. at her initial case planning conference on October 1, 2019. In its termination order, the district court relied on McGlinn's court reports about Mother telling G.P. that he would return to her care soon to find that Mother substantially neglected or willfully refused to comply with this task. Mother challenges this finding, asserting McGlinn testified her behavior with G.P. was appropriate.

Yet Mother misconstrues McGlinn's testimony. McGlinn testified Mother acted appropriately when *she* monitored her visitations with G.P. But in her court reports, McGlinn explained that according to Grandparents, when *they* monitored visitation, Mother sometimes talked with G.P. about his pending CINC case. Thus, we also find the district court did not err in making this finding.

25

*Participating in Family Therapy Reintegration Case Plan Task*

The district court approved Mother's reintegration case plan task to actively participate in family therapy at her initial case planning conference on October 1, 2019. In its termination order, the district court found Mother made inadequate progress on this task because she never participated in family therapy. Mother contends the district court erred by finding she substantially neglected or willfully refused to complete this task because she testified she would have participated in family therapy if it was ever offered by Cornerstones.

Yet, Mother's argument ignores why Cornerstones never offered her family therapy. McGlinn's testimony revealed Cornerstones would not offer family therapy until Mother complied with her other reintegration case plan tasks. She testified Mother was not offered family therapy because she "never got [her] stuff together." And Mother does not refute this testimony. As a result, clear and convincing evidence supported the district court's finding here as well.

*Conclusion—Mother Substantially Neglected or Willfully Refused to Complete Her Reintegration Case Plan*

Mother's remaining argument why the district court erred by finding her presumptively unfit under K.S.A. 38-2271(a)(5) is that the district court erroneously downplayed the fact that she completed her age-appropriate parenting class when considering her reintegration case plan task progress. But as with her previous arguments, Mother's complaint about the district court ignoring her completion of the age-appropriate parenting class requires this court to reweigh the evidence in her favor. See *In re Adoption of Baby Girl G.*, 311 Kan. at 806. Simply put, although it is good that Mother completed her task to take an age-appropriate parenting class, the weight of the evidence supported the district court's finding that on the whole, Mother substantially neglected or willfully refused to complete her court-approved reintegration case plan.

As the district court stressed in its termination order, G.P.'s CINC "case was initiated due to both parents' drug use and the condition of their home." Clear and convincing evidence established that at the very least, Mother substantially neglected to follow her substance abuse and housing-related reintegration case plan tasks after the State petitioned the district court to find G.P. a child in need of care on July 5, 2019. Although Mother loves G.P., Mother's multiple DUI and possession charges during G.P.'s CINC case as well as Grandfather's testimony about the trailer's continuing hazardous condition, proves Mother cannot safely care for G.P.

CONCLUSION

DCF took custody of G.P. because of Mother's serious, ongoing substance abuse and housing problems. During G.P.'s 22-month plus CINC case, though, Mother made no progress on her critical reintegration case plan tasks addressing her substance abuse and housing problems. Thus, Mother's serious, ongoing substance abuse and housing problems constituted clear and convincing evidence that Mother was currently, and in the foreseeable future, unfit to parent G.P. and it was in G.P.'s best interests for the district court to terminate Mother's parental rights.

Affirmed.